Hazel PADEN et al., Petitioners,

v.

**U. S. DEPARTMENT OF LABOR and the Secretary of the Department of Labor, Respondents.**

**No. 76–1970.**

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1977.

Decided Sept. 26, 1977.

Donald R. Schuering, Quincy, Ill., for petitioners.

Donald S. Shire, Associate Sol., John R. Garson, Christina M. Cerna, Attys., U. S. Dept. of Labor, Washington, D.C., for respondents.

Before FAIRCHILD, Chief Judge, and TONE and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Petitioners are former employees of Motorola, Inc., who were engaged in the manufacture of either monochrome (black and white) television sets or automotive sound equipment at Motorola's plant in Quincy, Illinois. In May 1974, Motorola sold its trade name "Quasar" and all its television producing assets to Matsushita Electric Industrial Company, Ltd., a Japanese firm. Matsushita exercised an option to purchase the Quincy plant from Motorola and agreed to take over the plant in May 1976. During the interim, Motorola continued producing Quasar televisions and billed the appropriate subsidiary of Matsushita for the completed sets. Also during this period, Motorola began transferring its automotive sound equipment production from Quincy to its plant in Seguin, Texas in preparation for the conveyance of the plant to Matsushita.

In April 1975, Matsushita changed its manufacturing plans due to excess production capacity and decided to consolidate all Quasar television production at its plant in Franklin Park, Illinois. As a result, all television production at the Quincy plant was terminated in August 1975. All automotive sound equipment workers were terminated in May 1976.

On January 16, 1976, petitioners and those employees previously engaged in the production of color televisions at the Quincy plant applied to the Secretary of Labor for certification of eligibility to apply for worker adjustment assistance under 19 U.S.C. § 2271, et seq.[1] Pursuant to 29 C.F.R.

---

1. Section 2272, which establishes the requirements for certification, provides as follows:

 The Secretary shall certify a group of workers as eligible to apply for adjustment assistance under this part if he determines—

 (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated,

§ 90.12 the Director of the Office of Trade Adjustment Assistance conducted an investigation to determine whether the applicants qualified for certification.

The investigation disclosed that while imports of color televisions increased in absolute numbers from 1971 to 1973, and then declined in 1974 and 1975, the number of imports increased relatively from 1974 to 1975.[2] The investigation further disclosed that imports of automotive sound equipment increased absolutely each year from 1971 to 1973 but declined absolutely from 1974 to 1975. Imports of automotive sound equipment decreased relatively from 1971 to 1972, increased relatively each year from 1972 through 1974, and then decreased relatively in 1975. With respect to monochrome televisions, imports increased absolutely from 1971 to 1972, and then decreased absolutely each year from 1972 to 1975. Imports of monochrome televisions increased relatively each year from 1971 to 1974, but decreased relatively from 1974 to 1975. On the basis of the results of the investigation, the Secretary determined that an increase in imports of color televisions contributed importantly to the closing of television operations at Quincy. Thus, the Secretary certified those color television workers who had been separated from their employment between January 16, 1975, and November 1, 1975. The Secretary further concluded, however, that the investigation failed to disclose the existence of an increase in imports of automotive sound equipment or monochrome televisions as required by 19 U.S.C. § 2272(3). Accordingly, the Secretary denied certification to those workers engaged in the production of automotive sound equipment and monochrome televisions.

Petitioners first challenge the Secretary's conclusion that there were not "increases of imports" within the meaning of 19 U.S.C. § 2272(3), contending that the Secretary erred in two respects.[3] First, petitioners argue that the Secretary is obligated to compare years prior to the year immediately preceding the year of separation with the actual year of separation in determining whether there has been an increase in imports. Thus, a comparison of import statistics between any year from 1971 through 1973 with 1975 indicates a relative increase in the imports of both monochrome televisions and automotive sound equipment. Similarly, imports of automotive sound equipment increased absolutely in 1975 when that year is compared to either 1971 or 1972. Secondly, petitioners submit that the Secretary is required to compare imports for years other than the year of sepa-

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

For purposes of paragraph (3), the term "contributed importantly" means a cause which is important but not necessarily more important than any other cause.

2. Two "relative" statistics were arrived at for each year from 1971 to 1975 by comparing the absolute number of imports to the number of products produced domestically and to the number of products consumed domestically. Thus, from 1974 to 1975 the quantity of imported color televisions increased with respect to the amount of color televisions produced domestically and to the amount of color televisions consumed domestically.

3. "Increased imports" is defined in 29 C.F.R. § 90.2 (1975) to mean that "imports have increased either absolutely or relatively, and would generally mean those increases as have occurred from a representative base period subsequent to the effectiveness of the most recent trade agreement concessions proclaimed by the President beginning in 1968."

The final tariff concession ended January 1, 1972, thus the Secretary will not consider years prior to 1972 as a base period year. Also, the Secretary will generally consider only the year immediately preceding the year of separation as a base period year unless there is a valid reason to consider a different year. A valid reason would exist, according to the Secretary, where a major customer puts the firm on notice in 1973 that it intends to switch to imports in 1975. If imports increased in 1973 but decreased in 1975, the 1973 figures would be relevant.

ration with preceding years in arriving at his determination. Viewing import statistics in this manner reveals a relative increase in imports of monochrome televisions between any two years from 1971 through 1974, and a relative increase in imports of automotive sound equipment between any two years from 1972 through 1974. In terms of absolute numbers, imports of monochrome televisions increased between 1971 and 1972, and imports of automotive sound equipment increased each year from 1971 through 1973.

 The resolution of petitioners' argument depends upon the interpretation of "increases of imports" in 19 U.S.C. § 2272(3). We find nothing in the language of the statute itself to indicate the meaning of this requirement. Although the meaning proposed by petitioners is feasible, the term itself is nonetheless unclear and susceptible to various different interpretations. Thus, the following general rule which accords deference to the administrator's interpretation is applicable here.

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n of Territory of Alaska v. Aragon, [Aragan]* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136. See also *e.g., Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; *Universal Battery Co. v. United States,* 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of

making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Development Co. v. International Union of Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924. *Udall v. Tallman,* 380 U.S. 1, 16, [85 S.Ct. 792, 13 L.Ed.2d 616] (1965). See also *Shea v. Vialpando,* 416 U.S. 251, 262, n. 11 [94 S.Ct. 1746, 40 L.Ed.2d 120] (1974).[4]

The persuasiveness of the Secretary's interpretation "depends upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade if lacking power to control." *Case & Company, Inc. v. Board of Trade of City of Chicago,* 523 F.2d 355, 361 (7th Cir. 1975), citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). It is "entitled great weight and should be followed unless there are compelling indications that it is wrong." *Old Ben Coal Corp. v. Interior Board of Mine Operations Appeals,* 523 F.2d 25, 36 (7th Cir. 1975).

 Upon review of the Secretary's reasoning, the relevant legislative history, and the Secretary's previous determinations, we are convinced that deference should be given the Secretary's interpretation of "increases of imports" in this case. The Secretary submits that by confining consideration to imports during the year of separation and the immediately preceding year, the Secretary can focus on those imports which are most likely to affect employment in the year of separation while diminishing consideration of those factors which, while affecting employment, are not within coverage of the act. Although petitioners' contention that imports in any given year may adversely affect employment several years later is not without validity and is indeed recognized as a distinct possibility by the Secretary, we are not convinced that the Secretary's practice should be condemned

---

4. For a thorough discussion of the legislative history of the Trade Expansion Act of 1962 and an application of these general rules of construction to another provision of this statute,

see *United Shoe Workers of America, AFL–CIO v. Bedell,* 165 U.S.App.D.C. 113, 506 F.2d 174 (1973).

either generally or under the circumstances of this particular case.

The present provision regarding eligibility for assistance requires that the Secretary determine the existence of "increases of imports." The prior provision dealing with eligibility required an investigation to determine whether an article "is being imported." 19 U.S.C. § 1901(c)(2) (1970). If the investigation disclosed, among other things, the existence of "increased imports," the President could under prior law grant worker certification. 19 U.S.C. § 1902(c) (1970). We think that by requiring a determination that an article "is being imported," Congress indicated that imports during the year of separation affect employment greater than any other year and that the interest of this legislation was to remedy unemployment created by an increased number of imports in the current year. Throughout the legislative history numerous references are made to changes in the present assistance provision that are designed to ease the requirements for worker assistance. See, e.g., S. Rep. No. 93–1298, 93rd Cong., 2d Sess., (1974), reprinted in [1974] U.S. Code Cong. & Admin. News pp. 7186, 7205, 7275. Nowhere in the legislative history, however, does Congress attach any significance to the change from "is being imported" to "increases of imports." Moreover, the terms "increased imports" and "is being imported" are used interchangeably in other sections of the act as they were in the previous eligibility section. See e.g., 19 U.S.C. § 2251(b)(1) and 19 U.S.C. § 2251(b)(6). Although neither of those terms appear in the text of the current eligibility provision, the legislative history is replete with references to "increased imports" when worker eligibility assistance is referred to. See e.g. [1974] U.S. Code Cong. & Admin. News pp. 7205, 7275, 7276 and 7283. Thus, it appears that the change from "is being imported" to "increases of imports" reflects merely a change in wording and not a change in Congress' belief regarding the effect of current imports or the primary intent of the statute.

The Secretary's interpretation of "increased imports" is also supported by Congress' recognition that factors other than imports could affect employment. In discussing an amendment that would provide relief only where imports increased absolutely, the Senate Finance Committee noted: [5]

> Similarly, total or partial separations that would have occurred regardless of the level of imports, e.g., those resulting from domestic competition, seasonal, cyclical or technological factors are not intended to be covered by the program. To this end it is required that imports increase absolutely—since it is more likely to be the case under conditions of absolute increases of imports of like and directly competitive products that imports would contribute importantly to the total or partial separation of workers or the threat of such total or partial separation.

S. Rep. No. 93–1298, [1974], U.S. Code Cong. & Admin. News p. 7275. In this case, the investigation disclosed that separations were caused by a shift in consumer preference from monochrome to color televisions, and that imports and domestically produced monochrome televisions actually served two distinct consumer preferences based upon the size of television screens. The investigation also disclosed a steady decline in domestic production of automotive sound equipment attributable to the decline in domestic auto production in 1974–1975 and the general economic recession occurring at that time.

Finally, the Secretary's interpretation of "increases of imports" is consistent with rulings on eligibility petitions both prior and subsequent to the ruling in this case. See e.g., Singer Co., 40 Fed.Reg. 32391 (1975); Oile Moore Manufacturing Co., 41 Fed.Reg. 4692 (1976); American Motors Corp., 41 Fed.Reg. 48801 (1976). For these reasons we hold that the Secretary's conclusion regarding the statutory requirement of "increases of imports" was not erroneous.

5. This amendment was defeated in conference. House Conference Report No. 93–1644, 93rd Cong., 2d Sess., reprinted in [1974] U.S. Code Cong. & Admin. News pp. 7367, 7379.

■ Petitioners next argue that the Secretary is obligated to certify all workers adversely affected by an increase in the number of imports of any article produced by the workers' firm without regard to the number of imports of articles produced in the workers' particular subdivision. Under this theory, petitioners would be certified because an increase in the number of imports of color televisions contributed importantly to the closing of the Quincy plant and petitioners' ultimate separation from Motorola.

This argument raised by petitioners again involves a question of statutory interpretation. Petitioners assert that "appropriate subdivision" in § 2272 should be interpreted broadly to include the entire Quincy plant as a subdivision of the firm of Motorola. The Secretary on the other hand interprets "appropriate subdivision" to mean only that division which produces articles like or directly identical to those imported. "Appropriate subdivision" is defined in 41 C.F.R. § 90.2 as ". . . an establishment in a multi-establishment firm which produces the domestic articles in question or a distinct part or section of an establishment (whether or not the firm has more than one establishment) where the articles are produced."

The uncertainty of the meaning of "appropriate subdivision" in § 2272 again requires us to accord great weight to the Secretary's interpretation. We find the Secretary's interpretation to be far more reasonable than petitioners' which would in practicality destroy all distinctions between product lines when throughout the Trade Act Congress carefully limited relief to injury from articles "like or directly competitive." See e.g., 19 U.S.C. §§ 2251, 2272,

2341 and 2371. Moreover, the Secretary's interpretation is supported expressly by § 2272 which requires the Secretary upon notification of an investigation by the Trade Commission to . . . immediately begin a study of—

(1) the number of workers in the domestic industry *producing the like or directly competitive article* who have been or are likely to be certified as eligible for adjustment assistance, and

(2) the extent to which the adjustment of such workers to the import competition may be facilitated through the use of existing programs. (Emphasis added.)

See also, S. Rep. No. 93–1298 [1974] U.S. Code Cong. & Admin. News pp. 7275–76.

Finally, the Secretary has applied this same interpretation in prior and subsequent rulings. See e.g., *Chrysler Corp.*, 40 C.F.R. 33292 (1975); *American Motors Corp.*, 41 Fed.Reg. 48801 (1976).

■ Petitioners next contend that the Secretary erred by refusing to certify employees who were transferred from color television production to other jobs because of increased imports prior to November 1, 1975, but who were separated from their employment after that date.[6] We note first that color television employees who were transferred to other positions between January 16, 1975, and November 1, 1975, are included within the Secretary's certification as are totally separated employees if they qualify as partially separated employees under § 2319(6).[7] The Secretary has determined that an increase in imports of color televisions contributed importantly to the partial separation of color television employees, thus those employees are "adversely affected workers" within § 2319(2).[8]

---

**6.** The Secretary informs us that November 1, 1975, was chosen as the termination date for certification because all color television workers were separated by August, 1975. The additional period after August was intended to ensure coverage of other workers whose jobs were related to color television production, such as clerical and maintenance positions.

**7.** 19 U.S.C. § 2319(6) provides:

The term "partial separation" means, with respect to an individual who has not been totally separated, that he has had—

(A) his hours of work reduced to 80 percent or less of his average weekly hours in adversely affected employment, and

(B) his wages reduced to 80 percent or less of his average weekly wage in such adversely affected employment.

**8.** "Adversely affected worker" is defined in 19 U.S.C. § 2319(2) as follows:

Once transferred, however employees who become totally separated are not entitled to certification unless an increase in imports of articles like or directly competitive with the articles produced by those workers contribute importantly to the separation. For the reasons fully explained earlier in this order, only those employees in the color television subdivision at the time of separation are entitled to certification.

Petitioners lastly contend that the Secretary erred in failing to certify employees involved in jobs indirectly related to color television production, e.g., shipping and receiving. The Secretary responds, however, that these workers are included within the Secretary's certification to the extent of their involvement in color television production. (Secretary's brief at 29). Thus this issue raised by petitioners is not before us.

REVIEW DENIED.

The term "adversely affected worker" means an individual who, because of lack of work in adversely affected employment—
(A) has been totally or partially separated from such employment, or
(B) has been totally separated from employment with the firm in a subdivision of which such adversely affected employment exists.