**UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA, LOCAL 798, Petitioner,**

v.

**Raymond J. DONOVAN, United States Secretary of Labor, Respondent.**

**No. 80–1920.**

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1981.

Decided June 25, 1981.

Timothy P. McLaughlin, South Bend, Ind., for petitioner.

James A. Greene, Dept. of Labor, Washington, D.C., for respondent.

Before BAUER, Circuit Judge, PECK, Senior Circuit Judge * and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

The United Rubber, Cork, Linoleum and Plastic Workers of America, Local 798 ("Local 798") petitions this court for review of a final decision by the Secretary of Labor ("Secretary") that certain members of Local 798 are not eligible to apply for worker adjustment assistance under Subchapter II, Part 2 of the Trade Act of 1974, 19 U.S.C. §§ 2271–2322 (1976). Because the record before us does not provide sufficient evidence to support the Secretary's decision, we vacate and remand for further proceedings.

## I.

The Trade Act of 1974, 19 U.S.C. § 2101 *et seq.* (1976), is an ambitious program designed both to foster economic growth and full employment in the United States and to strengthen economic relations with foreign nations by promoting "open and non-

---

\* The Honorable John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

discriminatory world trade." 19 U.S.C. § 2102 (1976). Through the Act, Congress gave the President broad authority to negotiate bilateral and multilateral trade agreements that would reduce or eliminate tariffs and other barriers to international trade. At the same time, recognizing that vigorous import competition often causes serious economic dislocations, Congress included in the Act several programs "to assist industries, firm [sic], workers, and communities to adjust to changes in international trade flows." 19 U.S.C. § 2102(4) (1976). See 19 U.S.C. §§ 2251–53 (import relief for domestic industries), §§ 2271–322 (adjustment assistance for workers), §§ 2341–54 (adjustment assistance for firms), §§ 2371–74 (adjustment assistance for communities).

Under the worker assistance program, the Secretary is authorized to provide substantial benefits to workers who are partially or totally separated from their employment because of import competition. These benefits include compensation equal to 70% of a worker's average weekly wage (up to 100% of the average weekly manufacturing wage), training allowances, and job search and relocation expenses. 19 U.S.C. §§ 2291–98 (1976).

To qualify for these benefits, a group of workers, their union or other authorized representative must file a petition with the Secretary for certification of eligibility to apply for adjustment assistance. Upon receipt of such a petition, the Department of Labor's Office of Trade Adjustment Assistance ("OTAA") conducts an investigation to determine whether the group of workers meets the following three eligibility requirements:

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272 (1976).

If it is determined that these three requirements are satisfied, the Secretary is to certify the group as eligible to apply for adjustment assistance. Members of the group may then file individual applications for benefits with the Secretary. See 19 U.S.C. §§ 2291–98 (1976).

II.

On November 12, 1979, Local 798 submitted a petition for adjustment assistance to the Secretary on behalf of its members engaged, or formerly engaged, in the production of automotive bushings, window channeling and beltstrips at General Tire and Rubber Company's Logansport facility. Upon receipt of the petition, OTAA initiated an investigation of Local 798's claims and published a notice of the investigation in the Federal Register on December 11, 1979. 44 Fed.Reg. 71478 (1979).[1] OTAA's investigation consisted of an analysis of information provided by General Tire and Rubber Company, its customers, the Department of Commerce, the International Trade Commission, industry analysts and the Department of Labor. A written report of the results of this investigation was issued on April 7, 1980.[2]

---

1. The notice included a provision that interested parties might request a public hearing on the subject of the investigation within ten days, see 19 U.S.C. § 2271(b) (1976); 29 C.F.R. § 90.13 (1980), but there was neither a request for a hearing nor a hearing held in connection with Local 798's petition.

2. OTAA consolidated its investigation of the Logansport petition with its investigation of petitions submitted on behalf of workers at General Tire and Rubber Company's plants in Wabash and Peru, Indiana, and the April 7, 1980, report includes the results of the investigations of the Wabash and Peru petitions. Although the Secretary also denied these peti-

OTAA's investigation found that the Logansport plant produces "silentbloc" bushings,[3] window channeling and beltstrips.[4] Although the report identifies bushings as the plant's "primary" product, information concerning the percentage of total production represented by the different products was deleted from the report because of its allegedly confidential nature. Aggregate national import figures set forth in the report indicate that imports of bushings had declined both relatively and absolutely from 1977 through 1979. Imports of mounts (which Local 798 argues may be commercially interchangeable with bushings) were found to have increased absolutely and relatively from 1977 through 1979, while imports of window channeling and beltstrips were found to be "negligible." The report also indicates that OTAA's survey of General Tire and Rubber Company's four major customers found that two of these customers imported no bushings during 1977–1979, while the third had decreased imports from 1978 to 1979, and the fourth had increased imports from 1977 to 1979 in terms of quantity, but not in terms of value.

On April 8, 1980, the Secretary, through certifying officer C. Michael Aho, denied the Logansport petition on the ground that the third requirement for certification had not been satisfied. The April 8, 1980, decision reads, in relevant part:

Imported automobiles cannot be considered to be like or directly competitive with domestically produced bushings. Imports of bushings must be considered in determining import injury to workers producing bushings and bushing components at the Logansport and Peru, Indiana plants of The General Tire and Rubber Company.

U.S. imports of bushings decreased absolutely and relative to domestic consumption from 1977 to 1978 and from 1978 to 1979.

Surveyed customers of The General Tire and Rubber Company revealed that they either purchased no imports of bushings or decreased purchases of imported bushings from 1978 to 1979.

Local 798 requested administrative reconsideration of this decision pursuant to 29 C.F.R. § 90.18 (1980), urging that "[n]o consideration was given to Local # 798 members that produce window channeling. (Beltstrip and Channel)." On May 9, 1980, the Secretary, through certifying officer Harry J. Gilman, denied Local 798's request for reconsideration, finding that certification could not have been based on decreased production of window channeling and beltstrips.[5] On July 7, 1980, Local 798 filed a petition in this court for review of the Secretary's denial of certification.

tions, Local 798's appeal concerns only the Secretary's denial of the Logansport petition.

3. This product is described in the report as follows:
   Silentbloc bushings (General Tire's trade name) are generically known as suspension bushings or isolation mountings. The major use of silentbloc bushings is in the steering portion of the front end suspension; minor uses are in idler arms and tie rods. A silentbloc bushing consists of an outer metal sleeve (or tube), an inner metal sleeve and a rubber sleeve between the two metal sleeves. The Logansport plant assembles these rubber and metal components into a silentbloc bushing and markets the bushing as a final product.

4. These products are described in the report as follows:
   Window channel and beltstrips are molded rubber strips that act as an absorbing and

channeling device around glass windows in automobiles.

5. The May 9, 1980, opinion reads, in relevant part:
   The Department determined that the decrease in the production of bushings at the Logansport, Indiana, plant constituted the major part of the production decline at the plant while the decrease in production of window channeling and beltstrip was not enough, by itself, to have been an important contributory cause to the decline in the production and sales or to the total or partial separations of workers at the plant within the meaning of the Act. Further, the Department's survey of the industry indicated that imports of window channeling were negligible.
   45 Fed.Reg. 35052 (1980).

### III.

Local 798 maintains that the Secretary's denial of certification is not supported by substantial evidence because (1) the conclusion that imports of window channeling and beltstrips are negligible finds no support in the record, (2) the Secretary failed to consider the impact of increased imports of mounts on layoffs and work reductions at the Logansport plant, and (3) the record does not support the conclusion that surveyed customers of General Tire and Rubber Company either purchased no imports of bushings or decreased purchases of imported bushings from 1978 to 1979.

Our task on review of the sufficiency of evidence supporting the Secretary's determination is limited since, under the Act, "[t]he findings of fact by the Secretary, if supported by substantial evidence, shall be conclusive." 19 U.S.C. § 2322(b) (1976). Measured by this standard, however, we believe the evidence in the record before us is insufficient to support the Secretary's decision.

### A.

█ Although we know from the record that window channeling and beltstrips are not the primary products of the Logansport plant, we do not know what portion of total production they represent. However, the Logansport plant manager stated in an April 29, 1980, memorandum that "continuing reductions in the Channel and Beltstrip schedules ... necessitated the elimination of the 3rd shift in extruding, effective April 21, 1980." The memorandum also indicated that further steps, including the introduction of four-day work weeks, would be required because of reduced window channeling and beltstrip production. Thus, it is possible that decreased production of window channeling and beltstrips may have contributed to the layoffs and reduced work schedules of Logansport workers.[6]

The Secretary argues that increased imports did not contribute importantly to these layoffs and work reductions because the OTAA investigation found that imports of these articles were "negligible." This "finding," however, is no more than a conclusion drawn from the results of an OTAA industry study. The results of this study are not in the record before us, however, and we are therefore unable to determine whether this conclusion is supported by substantial evidence. On remand, the Secretary should set forth in reasonable detail the factual or statistical information on which this conclusion rests.

### B.

Although the Logansport plant does not produce mounts, Local 798 maintains that the impact of increased imports of mounts on the employment of Logansport workers should have been considered because mounts are similar in function to bushings. In this regard, Local 798 emphasizes that the record shows that imports of mounts increased both relatively and absolutely from 1977 to 1979 and that one of General Tire and Rubber Company's customers increased its imports of mounts from 1977 to 1979.

The Secretary argues in response that imported mounts are not "like or directly competitive" with bushings produced at Logansport within the meaning of Section 222(3) of the Act, 19 U.S.C. § 2272(3) (1976). The relevant inquiry in this regard is whether demand for bushings and mounts is cross-elastic, that is, whether bushings and mounts are "substantially equivalent for commercial purposes (i. e. adapted to the same uses and essentially interchangeable therefor)." 29 C.F.R. § 90.2 (1980). *See Machine Printers and Engravers Ass'n v. Marshall*, 595 F.2d 860, 862 (D.C.Cir.1979).

In support of his position that mounts are not interchangeable with bushings, the Secretary relies on the following paragraph in the investigative report:

Mounts are used as vibration isolators for the engine at the points where it is connected to the frame as well as in the

---

**6.** The certifying officer's contrary assertion in his May 9, 1980, denial of reconsideration, *see* note 5, *supra*, finds no support in the record and is not defended by the Secretary on appeal.

suspension system to support the body. The mounts are rubber pads which are bolted to the steel frame. A bushing performs similar functions as a mount but comes in the shape of a bearing. The bushing is made of rubber or rubber-on-metal construction for use with various mobile components of an automobile vehicle. The bushing is used as a separator for metal parts. If the bushing is made of rubber, it does not need lubrication. Wherever two metal pieces must be connected so that one metal piece is allowed to oscillate around the other, a bushing will usually be found.

It may well be (and, in fact, seems probable) that mounts and bushings, although they perform similar functions, are not commercially interchangeable. The brief descriptive paragraph quoted by the Secretary, however, does not constitute substantial evidence in support of such a finding. On remand, the Secretary should produce additional evidence or more cogent findings addressed directly to the question of the commercial interchangeability of mounts and bushings.

### C.

■ Local 798 maintains that the record fails to substantiate the Secretary's conclusion in the April 8, 1980, denial of certification that "[s]urveyed customers of The General Tire and Rubber Company revealed that they either purchased no imports of bushings or decreased purchases of imported bushings from 1978 to 1979." Local 798 properly notes that the OTAA investigation revealed that one of the four major customers of The General Tire and Rubber Company increased purchases of imported bushings from 1977 to 1978 and from 1978 to 1979 in terms of quantity (but not in terms of value).

Although counsel for the Secretary candidly admitted at oral argument that this discrepancy would pose a "serious problem" in a different case, he argues that it is, in essence, harmless error here, because the results of the customer survey would be relevant only if there were a determination that imports of bushings had increased nationally from 1978 to 1979 (the year immediately preceding the year of the workers' separation). Since Local 798 does not contest OTTA's finding that imports of bushings in fact decreased nationally from 1978 to 1979, the Secretary maintains that it is unnecessary to consider the Secretary's allegedly erroneous characterization of the evidence relating to the purchasing patterns of the customers of General Tire and Rubber Company.

The outcome of this argument depends, of course, on the validity of the Secretary's position that a nationwide decrease in imports precludes certification regardless whether increased imports by the customers of the petitioning workers' firm have contributed importantly to the partial or total separation of the petitioning workers. The language of the Act does not clearly compel the conclusion that a nationwide increase of imports is a *sine qua non* of certification, since Section 222(3) only requires the finding "that increases of imports of articles like or directly competitive with articles produced by [the petitioning workers'] firm ... contributed importantly to [the total or partial separation of a significant portion of workers at the firm], or threat thereof, and to [an absolute decrease in the sales or production of the firm]." 19 U.S.C. § 2272(3) (1976). In this context, we believe the phrase "increases of imports" cannot on its face be limited to the category of imports into the United States.[7] Nor is the Secretary's interpretation compelled by the legislative history[8] or the regulations.[9]

---

7. Alternative interpretations include increases of imports to sub-national markets or to only the customers of the petitioning workers' firm.

8. Under Section 301(c)(2) of the Trade Expansion Act of 1962, the predecessor provision to Section 222(3), the relevant inquiry was whether

as a result in major part of concessions granted under trade agreements, an article like or directly competitive with an article produced by such workers' firm ... is being imported into the United States in such in-

---

9. See note 9 on page 707.

The Secretary refers us to *Paden v. United States*, 562 F.2d 470 (7th Cir. 1977), in support of his position. It is true that this court in *Paden* upheld the Secretary's denial of certification of workers engaged in the production of automotive sound equipment and monochrome televisions on the ground that imports of these articles had declined nationally in the year preceding the year of separation. It is not clear, however, that the question of possible increased purchases of imports by the customers of the petitioning workers' plant was raised or considered in *Paden*, and nothing in the *Paden* opinion can properly be construed to mean that increased imports by customers or within a region (absent a national increase) should *never* be considered by the Secretary.

On the other hand, we should accord substantial deference to the Secretary's interpretation of the statute, *see Unemployment* *Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 153–55, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946), and we think here that such deference is decisive, since there seem to be good reasons why a nationwide decrease in imports *ought ordinarily to be an* absolute prerequisite to certification under the Act. The Act was drafted and adopted in the context of national markets for imported articles, and we think the finding of a nationwide increase in imports should be a *sine qua non* both as a matter of economics and of administrative feasibility.[10] In an extraordinary case, however, the Congressional policy of assisting workers displaced by import competition might be frustrated if consideration of increased imports on a less than national basis is *always* precluded by a finding of a nationwide decrease in imports.[11] We therefore believe the Secre-

creased quantities as to cause, or threaten to cause, unemployment or underemployment of a significant number or proportion of the workers of such firm or subdivision.
19 U.S.C. § 1901(c)(2) (1970).
This language, which was taken substantially intact from a standard "escape" clause used in international trade agreements, *see United Shoe Workers of America v. Bedell*, 506 F.2d 174, 177–83 (D.C.Cir.1974), strongly suggests that only national import figures were to be considered under Section 301(c)(2). Predecessor statutes are, of course, often useful in interpreting ambiguous provisions in successor legislation, especially in the absence of an indication that Congress intended to change the meaning of the successor provision. Section 222(3) was intended by Congress to "ease the requirements for worker assistance," *Paden v. United States*, 562 F.2d 470, 474 (7th Cir. 1977), however, and the substantial changes in the language and scope of Section 222(3) greatly diminish the value of looking to Section 301(c)(2) in interpreting the meaning of "increases of imports," even though the legislative history of Section 222(3) offers no explanation for the substitution of this phrase for the phrase "imported into the United States in . . . increased quantities."

9. Under the Senate's proposed version of Section 222(3), certification was to be granted only if the Secretary found an "absolute" increase in imports. The Senate included this restriction since, in its view, "it is more likely to be the case under conditions of absolute increases of imports . . . that imports would contribute importantly to [layoffs and work reductions]." S.Rep.No.93–1298, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 7275.

The Senate receded from this position in conference, however, and the regulations promulgated by the Secretary therefore defined "increases of imports" to mean that "imports have increased either absolutely or relatively. . . ." 29 C.F.R. § 90.2 (1980). This definition provides little guidance here, since relative or absolute increases of imports could occur at either the national or the sub-national levels.

10. Presumably in a market which is national in scope, a supplier's market is not limited to its existing customers. Therefore, if a supplier loses a particular customer to a foreign supplier in a market where domestic suppliers are otherwise displacing foreign competitors, that supplier may ordinarily be expected to find other customers in the national market. A supplier's failure to attract other customers in these circumstances may properly be assumed to be the function of factors unrelated to increased import competition such as, possibly, poor management or plant obsolescence. To require the Secretary to evaluate the validity of this assumption in every case where a firm lost one or more of its customers to a foreign competitor would be to require the Secretary to undertake economic analyses that in most cases would be both onerous and inconclusive.

11. There may be extraordinary circumstances (such as prohibitive transportation costs or other market entry barriers) that render analysis based on the assumption of a national market inadequate. We think the burden of showing such extraordinary circumstances would be heavy under the Act.

tary should consider increased imports on a less than national basis in those cases where exceptional circumstances (e. g. the existence of heavily insulated regional markets or of a "captive" producer) become apparent during the course of the Secretary's investigation.[12] Since such exceptional circumstances do not appear in this case, we reject Local 798's challenge to the Secretary's findings that imports of bushings have not increased during the relevant period within the meaning of the Act.

#### IV.

For the foregoing reasons, the Secretary's decision is vacated and remanded for further proceedings consistent with this opinion.

---

12. Of course, even when a nationwide increase in imports establishes a predicate for certification, the Secretary must still conduct a *customer* analysis to determine whether increased imports have "contributed significantly" to declining sales or production and layoffs or work reductions at the petitioning workers' plant. 19 U.S.C. § 2272(3) (1976). *See United Glass and Ceramic Workers v. Marshall*, 584 F.2d 398 (D.C.Cir.1978). The Secretary has informed us that certification investigations normally proceed in this manner.