Grace SMITH, et al., Plaintiffs,

v.

William Emerson BROCK, III, Secretary of Labor of the United States of America, Defendant.

Court No. 85–06–00745.

United States Court of International Trade.

Oct. 28, 1988.

D. Bruce Shine and Shelburne Ferguson, Jr., Kingsport, Tenn., for plaintiffs.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Velta A. Melnbrencis, New York City, for defendant.

## MEMORANDUM & ORDER

AQUILINO, Judge:

Defendant's decision(s) not to certify a group of workers as eligible to apply for adjustment assistance [1] under the Trade Act of 1974, 19 U.S.C. ch. 12, part 2, has led the group to commence this action and to move for judgment upon the agency record pursuant to CIT Rule 56.1.

---

**1.** See *Determinations Regarding Eligibility to Apply for Worker Adjustment Assistance, Burlington Industries, et al.,* 49 Fed.Reg. 49,733 (Dec. 21, 1984), and *Burlington Industries; Negative Determination Regarding Application for Reconsideration,* 50 Fed.Reg. 15,002 (April 16, 1985).

### I

The record contains a Petition for Trade Adjustment Assistance on behalf of employees at the Volunteer Plant of the Burlington Industries, Inc. Klopman Textured Woven Division in Bristol, Tennessee and another petition for such assistance for workers at that company's plant in Mountain City, Tennessee. The petitions characterized the plants' product as woven polyester fabric for use in wearing apparel. Both alleged, among other things, that:

—Half a million people in textiles and apparel have lost their jobs as a direct result of imports.

—Already, imports control one-third of the U.S. apparel market.

—In 1983 alone, foreign textile and apparel imports into the U.S. rose 25 percent and 140,000 jobs were lost. And in the first 3 months of 1984, imports were up almost 50 percent over the same period a year ago.[2]

And the petitions projected separations at the two plants of some 500 employees, many of whom are now plaintiffs herein.

In the face of such allegations, the Office of Trade Adjustment Assistance, Employment and Training Administration, U.S. Department of Labor[3] instituted investigations pursuant to 19 U.S.C. § 2271(a) to determine whether the workers were eligible to apply for assistance. *See* PubFile, pp. 13, 17; 49 Fed.Reg. 32,919 (Aug. 17, 1984). The statute stated at the time:

§ 2272. Group eligibility requirements

The Secretary shall certify a group of workers as eligible to apply for adjustment assistance under this part if he determines—

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

For purposes of paragraph (3), the term "contributed importantly" means a cause which is important, but not necessarily more important than any other cause.

The findings of the investigation(s) are reported at pages 40–63 of the record. After review thereof, the Department decided that the criterion of paragraph (3) for relief had not been met upon the stated rationale that Labor had

conducted a survey of the major customers that purchase polyester woven fabrics from Burlington Industries. This survey revealed that none of the customers surveyed increased their reliance on imported polyester woven fabrics in the January–July 1984 period compared to the same period in 1983. PubFile, p. 107.

The Department therefore denied eligibility.

The implication of this decision is that paragraphs (1) and (2) of section 2272 were met in the proceeding, a proposition which has support in the record. For example, it states that the Bristol plant had been in business over 30 years and would close permanently, while the Mountain City plant would phase out approximately 100 jobs, mostly in the weaving department. *See* PubFile, p. 57. Approximately 400 workers would be affected. *See id.* at 101. As for sales of the Klopman Division, encompassing the two plants in question, data in the record reveal a decline from January–August 1983 to the comparable period in 1984[4], while production at the Mountain City plant (but not Bristol) also dropped during the same time frame. *Compare*

---

**2.** Public File ("PubFile"), pp. 3, 18.

**3.** Referred to hereinafter collectively either as "Department" or "Labor".

**4.** *See* confidential record ("ConFile"), p. 58.

ConFile at 58 *with id.* at 59. *See also* Defendant's Memorandum, pp. 2–3, 7.

In any event, the petitioners requested reconsideration. The Department then ruled that there had been no error or misinterpretation of the law which would justify a reversal of its position, stating, for the most part:

> The investigative case file shows that ... production lost at the Bristol and Mountain City plants would be consolidated at other company plants. Findings also show increased production of polyester woven fabrics at the Bristol and Mountain City plants and increased company sales in 1983 compared to 1982. These data do not support the ... argument that increased imports in 1983 adversely affected ... sales and production. Neither loss of potential sales nor the profitability of the product provide a basis for certification.

> The application for reconsideration cites increased imports of fabric and apparel as the reason for a weakening fabric market and for Burlington's actions at the Bristol and Mountain City plants. Finished articles such as apparel cannot be considered like or directly competitive with component materials such as polyester woven fabric within the meaning of the Trade Act. U.S. imports of polyester woven fabric decreased, in quantity, in the first nine months of 1984 compared to the same period in 1983.

> The Department's survey of Burlington's customers showed that none of the respondents, which represented a significant portion of the Textured Woven Division's sales decline in the first seven months of 1984 compared to the same period in 1983, increased their reliance on imported polyester woven fabrics for the same period. Only data for the first seven months of 1984 were used in the Department's survey since production at both plants and corporate sales of polyester woven fabrics increased in 1983 compared to 1982. Several respondents to the survey reported reduced purchases from Burlington because new fashion styling is toward blends of polyester and wool and polyester and cotton. The Bristol and Mountain City plants produced 100 percent polyester woven fabric.

PubFile, pp. 111–12.

After denial of the request for reconsideration, this action was commenced, challenging the Department's decision(s) as defective and without basis and therefore not sustainable as supported by substantial evidence. The complaint prays that the negative determination be set aside or, alternatively, that the matter be remanded to the defendant to supplement and correct deficiencies in the record.

## II

Plaintiffs' motion is presented with understandable fervor. It raises issues, however, that transcend the scope and standard of judicial review prescribed by Congress in 19 U.S.C. § 2395 and 28 U.S.C. § 2640(c) and (d). This law states that the findings of Labor, "if supported by substantial evidence, shall be conclusive". 19 U.S.C. § 2395(b).

### A

■ Of the questions posed which are within the statutory framework of this court's competence, several focus on the survey the Department sought to conduct of Burlington customers. To begin with, the record reflects Labor selection for review of 15 accounts, which apparently amounted to 35 percent of the company's total sales for the periods January–July 1983 and 1984 and to 100 percent of the decline in sales, comparing the later period with the prior one. However, only seven of the 15 firms selected made any response to the Department's questionnaires, and Labor's reliance on the responses received has resulted in plaintiffs' now claiming that that reliance was fundamentally flawed and also challenging the agency's failure to exercise its subpoena power to compel answers from the eight silent accounts.

The use of partial surveys to determine the effect of imports on worker separation has been held to be sufficient. For example, in *Local 167, Int'l Molders and Allied Workers' Union, AFL–CIO v. Marshall,*

643 F.2d 26 (1st Cir.1981), the petitioners took exception to Labor's survey of purchases during the year of separation and the preceding year which comprised 49 percent and 68 percent of the closing foundry's total sales during the respective two years. In affirming Labor's use of such a survey, the court of appeals referred to information that the Department "normally attempts to survey several customers of different sizes and geographic locations, accounting for 25–30 percent of the subject firm's sales." 643 F.2d at 31.

This may be normal, as the 35–percent–of–sales starting point indicates herein, but in *Local 167* and in other recent cases the sales actually reviewed by the Department have reflected much higher percentages of the total pictures. *E.g., Estate of Finkel v. Donovan,* 9 CIT 374, 614 F.Supp. 1245 (1985) (60 percent); *Holloway v. Donovan,* 7 CIT 237, 585 F.Supp. 1427 (1984) (85 percent); *Cherlin v. Donovan,* 7 CIT 158, 585 F.Supp. 644 (1984) (62 percent). This is no doubt as it ought to be, for, as the court of appeals stated in *Local 167,* "the Secretary is obliged to conduct his investigation with the utmost regard for the interest of the petitioning workers." 643 F.2d at 31.

In *Stipe v. U.S. Department of Labor,* 9 CIT 543 (1985), customers accounting for 94.9 and 82.4 percent of the lost sales were surveyed. In the action at bar, the agency attempted to cover all the lost sales, but less than half of the customers gave any response and, at best, their decreased purchases were only equal to some 30 percent of the total loss.[5] Furthermore, the record lacks information from the two firms with the greatest declines in purchases for the period in question. *Compare* ConFile at 36–39 *with id.* at 64–81.

The plaintiffs argue that the larger of those two customers accounted for almost four times more purchases than did the responding firm with the most purchases of those complying.[6] They also justifiably contend that the absence of information from such customers is ground for remand and reconsideration. In *Donna Kelley v. Secretary, U.S. Department of Labor,* 9 CIT 646, 650, 626 F.Supp. 398, 401 (1985), the court held that the

> failure to consider data from the company that accounted for the largest decline in orders during [a review] period or to explain the absence of this data from the record determines that the methodology was not in accordance with law and, as such, cannot support a conclusion that the Secretary of Labor's determination is supported by substantial evidence.

In a subsequent opinion in the same case, the court stated that it did not

> propose to establish a specific level of sales or of a sales decline that must be accounted for in the record. The samplings in the record are so small, however, that they simply cannot provide sufficient support for the Secretary's denial of eligibility to apply for trade adjustment assistance, in the context of the information provided thus far.[7]

The court concluded that remand to the Department for further consideration was appropriate in view of such a shortcoming in the record. This court concurs, insofar as this action is concerned.[8]

**B**

█ The plaintiffs also challenge the Department's focusing only on the two January–July periods in reaching its decision.

---

**5.** *Compare, e.g.,* PubFile at 62 *with* ConFile at 113. Inspection of the record reveals the absence of complete answers on the part of some customers and also the use of "N/A", without indication as to whether that shorthand reference signifies "not applicable" or "not available". If the latter, the low overall response could be even less conclusive.

**6.** To look at it another way, the seven respondents' 1984 aggregate value of sales barely exceeded that of the largest customer. *Cf.* ConFile, pp. 36–39.

**7.** 10 CIT 250, 252, 633 F.Supp. 1374, 1376 (1986). While the court's judgment was subsequently vacated on appeal, 812 F.2d 1378 (Fed. Cir.1987), the ground for that result was procedural, not the point relied on herein.

**8.** Of course, on remand Labor may, in the exercise of its sound discretion, rely on its subpoena power under 19 U.S.C. § 2321 in obtaining sufficient information to meet the solemn obligations imposed by the Trade Act of 1974.

They plead for reliance on annual and cumulative data for the industry when surveying its economic and market status. *See, e.g.,* Plaintiffs' Memorandum, p. 3.

The agency, of course, had discretion to do as the plaintiffs pray, but it was not required to do so. For example, in *Paden v. U.S. Department of Labor,* 562 F.2d 470 (7th Cir.1977), the petitioners took issue with Labor's comparison of data for the year immediately prior to the worker separation with data for the year of that occurrence. They argued that Labor "is obligated to compare years prior to the year immediately preceding the year of separation with the actual year of separation in determining whether there has been an increase in imports." 562 F.2d at 472. They had also apparently requested the Department to compare the preceding years with years other than the one of separation. *See id.* at 472–73. The court of appeals reviewed section 2272(3), its legislative history, and previous determinations of Labor and upheld the agency's choice of review periods as a valid exercise of its discretion. Specifically, the Seventh Circuit stated that, by

> confining consideration to imports during the year of separation and the immediately preceding year, the Secretary can focus on those imports which are most likely to affect employment in the year of separation while diminishing consideration of those factors which, while affecting employment, are not within coverage of the act. Although petitioners' contention that imports in any given year may adversely affect employment several years later is not without validity and is indeed recognized as a distinct possibility by the Secretary, we are not convinced that the Secretary's practice should be condemned either generally or under the circumstances of this particular case. 562 F.2d at 473–74.

The same can be said for the Department's comparison of the periods at issue herein. *See, e.g., Former Employees of Homestake Mining Company v. Brock,* 12 CIT ——, ——, Slip Op. 88–41, at 7 (March 28, 1988) [available on WESTLAW, 1988 WL 30652]; *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW, Local 834 v. Donovan,* 8 CIT 13, 18, 592 F.Supp. 673, 677 (1984).

The August petitions filed in this matter led Labor to consider the first-half segments of 1984 and 1983 for the purpose of comparing those questionnaire responses received from Burlington's customers. That approach can hardly be gainsaid in view of record evidence showing that "production at both plants increased in 1983 compared to 1982, and corporate sales of polyester woven fabrics increased in 1983 compared to 1982". PubFile, p. 63.

### C

■ The plaintiffs press the proposition that imported, finished apparel made out of blends with cotton or wool were "directly competitive" with the Burlington polyester woven fabric at issue and also that that apparel is "substantially equivalent for commercial purposes" to the product from Bristol and Mountain City. The language quoted has been drawn by them from H.R. Rep. No. 1435, 91st Cong., 2d Sess. 25 (1970) in regard to the Trade Expansion Act of 1962, a predecessor of the Trade Act of 1974. Indeed, the later enactment (quoted above, section 2272(3)) requires the Secretary to consider "increases of imports of articles like or directly competitive with articles produced by [petitioning] workers' firm". The plaintiffs eschew any desire to rely on the statutory element "like" in pressing their point [9] —in the light of *Gropper v. Donovan,* 6 CIT 103, 569 F.Supp. 883 (1983).

In that case, as here, the petitioning workers asserted that an increase in the importation of finished garments had a negative effect upon domestic production of finished fabric for domestically-manufactured clothing. An issue before the court was whether the imported merchandise was "like or directly competitive" with the product of the plaintiff. The court, in its thorough opinion relying on *United Shoe Workers of America, AFL–CIO v. Bedell,*

---

**9.** *See generally* Plaintiffs' Third Memorandum.

506 F.2d 174 (D.C.Cir.1974); *Machine Printers & Engravers Ass'n of United States v. Marshall,* 595 F.2d 860 (D.C.Cir. 1979), and *Morristown Magnavox Former Employees v. Marshall,* 671 F.2d 194 (6th Cir.), *cert. denied sub nom. Kyle v. Donovan,* 459 U.S. 1041, 103 S.Ct. 458, 74 L.Ed.2d 610 (1982), answered in the negative, as follows:

> ... [T]he finished fabric in the present case is a *component* of a finished article, knit fabric garments, that has been adversely impacted by increased imports. Hence, the finished fabric is not embraced by the phrase "like or directly competitive" in section 222(3), since it is neither interchangeable with, nor substitutable for the import-impacted knit fabric garment.[10]

On its face, this conclusion is not hinged solely on "like", and counsel's careful attempt to focus on "directly competitive" is of little avail in this analogous action. But even if the ambit of the concept were broader, there is little in the record as it stands to support a finding either of directness on the part of the competition or of its substantial equivalency for commercial purposes. Apparently, the latter concept, in the eyes of Congress, encompasses articles that are adapted to the same uses and are essentially interchangeable. *See, e.g.,* H.R.Rep. No. 1435, 91st Cong., 2d Sess. 25 (1970).

### D

As indicated above, plaintiffs' motion is based on claims which fall beyond the boundaries of judicial resolution. For example, it is contended that the Secretary of Labor "evidenced a lack of comprehensive knowledge of the textile/apparel industry, to-wit, the interrelation and interdependency of the two processes"[11] and that he "failed to understand economic conditions during the time in question." Plaintiffs' Memorandum, p. 6. Such averments are set forth herein only to indicate that the court has carefully considered all of them and has concluded that only the one discussed in Point IIA above entitles the plaintiffs to any relief in this action.

That relief entails, at the moment, grant of plaintiffs' motion on that point on the record, as it stands, and remand of the matter to the defendant for further proceedings not inconsistent with this memorandum.

The defendant shall file within 45 days hereof the results of any further proceedings. The plaintiffs may have 15 days thereafter in which to respond, and the defendant may have ten days to reply thereto.

So ordered.

---

10. 6 CIT at 109, 569 F.Supp. at 887 (emphasis in original).

11. Plaintiffs' Memorandum, p. 6.