**R.E. ABBOTT, et al., Plaintiffs,**

v.

**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Defendant.**

No. 81–1–00028.

United States Court of International Trade.

Aug. 9, 1983.

Bruce M. Frey, Marion, Ind., for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Washington, D.C., Director, Commercial Litigation Branch (Sheila N. Ziff, Washington, D.C., on brief), for defendant.

*On Plaintiffs' Motion for Review of Administrative Determination upon Agency Record*

RE, Chief Judge:

Plaintiffs, on behalf of former employees of the Dana Corporation's Marion, Indiana plant, challenge a determination by the Sec-

retary of Labor which denied them certification of eligibility for benefits under the worker adjustment assistance program of the Trade Act of 1974, 19 U.S.C. §§ 2101–2487 (1976 & Supp. IV 1980). In substance the Secretary found that only those workers in Departments 225 and 230, which produced journal crosses and bearing races, met the criteria for eligibility set forth in section 222(3) of the Trade Act of 1974, 19 U.S.C. § 2272(3) (1976). The Secretary found that production workers other than those in the two certified departments, and service workers who provided ancillary and support services to both certified and noncertified departments, did not meet the eligibility criteria.

Plaintiffs contend that all workers at the plant are entitled to receive trade adjustment assistance benefits because they were separated from employment due to increased imports of "articles like or directly competitive" with articles produced at the Marion plant. They assert that the Secretary's determination, that some of the workers employed at the plant are not eligible for benefits, is not supported by substantial evidence. They further allege that the Secretary's determination violates their constitutional guarantee of equal protection under the law.

After reviewing the original and supplemental administrative records, and the arguments and briefs of the parties, the court concludes that, as to the production workers other than those in Departments 225 and 230, the Secretary's denial of certification of eligibility was made in accordance with law and is supported by substantial evidence contained in the administrative record. As to the service workers, this action is remanded to the Secretary of Labor for redetermination in accordance with this opinion.

*Facts*

On February 26, 1980, Local 113 of the Allied Industrial Workers of America filed with the Department of Labor's Office of Trade Adjustment Assistance (OTAA) a petition requesting certification of eligibility

for trade adjustment assistance benefits for all employees of the Dana Corporation's Marion, Indiana plant. Subsequently, OTAA published a Federal Register notice indicating that the petition had been received, that an investigation had been commenced, and that interested parties had ten days within which to request a public hearing. 45 Fed.Reg. 15731 (1980).

OTAA's investigation was conducted by mail. It obtained from the Dana Corporation's Headquarters information about the corporation, the work force, production, and use of imports at the Marion plant. Additionally, OTAA conducted a survey of major American automotive manufacturers to determine the aggregate domestic production and consumption of drive shafts and universal joints, the kinds of articles produced at the Marion plant. OTAA's investigators did not visit the Marion plant, nor was a public hearing requested or held.

The investigation disclosed that the Dana Corporation manufactures and markets a variety of automotive products. At the Marion plant, Dana manufactures components used in the production of drive shafts and universal joints, such as journal crosses, bearing races, stub shafts, sleeves, end yokes, mid-ship stubs, bolts and lock straps. OTAA also found that Dana imported significant quantities of some components for use in its Marion plant. Most of the component parts are assembled at the Marion plant into drive shaft units and universal joint kits for light trucks and then sold to various American automobile manufacturers. A smaller number of components are sold, assembled and unassembled, for use in the manufacture of heavy duty trucks.

The investigation also disclosed that the principal components of the drive shafts and universal joint kits were journal crosses and bearing races. The Marion plant's imports of journal crosses increased in value from fiscal year 1978 (ending August 31, 1978) to fiscal year 1979, and in the first half of fiscal year 1980 compared with the same period in fiscal year 1979. Imports of bearing races also increased during the first half of fiscal year 1980 compared with the

first half of fiscal year 1979. During these same time periods, the number of journal crosses and bearing races produced at the Marion plant decreased. The imported journal crosses and bearing races are identical to those produced at the Marion plant, and represented a substantial proportion of total plant production during fiscal years 1979 and 1980.

A survey of the major domestic motor vehicle manufacturers revealed that importations of assembled universal joints and drive shafts were negligible. Although the absolute number of these imports increased during 1977–79, the rate of imports as compared to domestic products during 1979 was approximately 2 percent. The survey also indicated that after increasing during 1977 and 1978, total domestic production of universal joints and drive shafts declined during 1979.

OTAA's investigative report showed that the largest portion of the Marion plant's direct labor costs are attributed to the production of component parts. The assembly of the components into drive shafts and universal joint kits accounts for a much smaller percentage of labor costs. Because the workers move among various work stations according to the production schedule, they are not readily identifiable by product lines. Moreover, layoffs and recalls are based on a plant-wide seniority system in which "bumping" between departments is permitted.

Employment at the Marion plant declined during the fourth quarter of fiscal year 1979 and continued to decline during the first half of 1980. Temporary layoffs began in July 1979 and continued through February 1980 when plaintiffs filed their petition for certification.

Basing his findings on the foregoing information, the Secretary concluded that:
[I]ncreases of imports of articles like or directly competitive with journal crosses and bearing races produced at the Marion, Indiana plant of the Dana Corporation contributed importantly to the decline in sales or production and to the total or partial separation of workers at

that plant. In accordance with the provisions of the Act, I make the following certification:

All workers of the Marion, Indiana plant of the Dana Corporation engaged in employment related to the production of journal crosses and bearing races who became totally or partially separated from employment on or after June 1, 1979 are eligible to apply for adjustment assistance under Section 223 of the Trade Act of 1974.

On July 3, 1980, plaintiffs filed a request for administrative reconsideration contending that OTAA's failure to conduct a field investigation deprived them of an opportunity to explain the full circumstances of their petition. Plaintiffs adverted that OTAA had not considered the effect of imports of components other than journal crosses and bearing races, and claimed that increased imports were having an adverse impact on *all* workers at the plant.

On August 4, 1980, OTAA granted plaintiffs' request. Prior to the granting of the request for reconsideration, OTAA sought additional information from plaintiffs' employer. Dana responded by sending additional copies of the material previously submitted, together with additional information as to quantities of imported end yokes, mid-ship stubs and stub shafts.

At approximately the same time, the Indiana State Employment Service, the state agency responsible for implementing the certification decision, sought clarification of OTAA's certification, stating that it "cannot be interpreted by this agency as to who is covered and who is not."

In turn, a similar request for assistance in the interpretation and application of the certification determination was made by OTAA's regional office in Chicago, Illinois. The regional office suggested that, since journal crosses and bearing races are integral parts of universal joints and drive shafts "the [state] agency, employer and claimants are unable to comprehend the rationale for not certifying the universal joints and drive shafts."

For the purpose of clarifying its certification, on August 28, 1980, OTAA issued a memorandum stating that the certification covered only Departments 225 and 230.

Thereafter, the Secretary rendered a negative determination on reconsideration. In the course of his determination, the Secretary noted plaintiffs' contentions that (1) imports of drive shaft components, other than journal crosses and bearing races, for use at Dana's Marion plant had caused layoffs; and that (2) Dana lost business due to increased imports of vehicles already fitted with drive shafts. Despite these claims, the Secretary found that, with respect to universal joints and drive shafts, the investigation disclosed that the "increased import" criterion of section 222(3) was not satisfied because the ratio of imports to domestic production for those articles was approximately 2 percent in 1979; and that Dana did not import universal joints or drive shafts; but did import the components for them. 45 Fed.Reg. 62584 (1980).

The Secretary also found that the imports of components, other than bearing races and journals, are "generally directly related to production of such components at the Marion plant. For example, as component production increases or decreases, imported components increase and decrease, respectively."

Finally, the Secretary found that there was no validity to plaintiffs' contention that Dana lost business due to increased imports of motor vehicles already fitted with drive shafts, since under the applicable case law a finished article, *i.e.*, the motor vehicle, cannot be considered like or directly competitive with its component parts, *i.e.*, drive shafts and universal joints. *See United Shoe Workers of America, AFL–CIO v. Bedell,* 506 F.2d 174 (D.C.Cir.1974).

Plaintiffs then commenced this action. Subsequent to the court's order directing that this action be submitted for determination as prescribed by Rule 56.1, plaintiffs moved to supplement the administrative record. Plaintiffs alleged that the November 5, 1981 decisions of the appeals referee for the Indiana Employment Security Divi-

sion, "as to whether individual plaintiffs herein and other employees * * * are eligible" for trade adjustment assistance benefits, are relevant to the court's consideration of the administrative record.

The court denied plaintiffs' motion and remanded the action to the Secretary for further administrative consideration in light of plaintiffs' offer of new evidence. *Abbott v. Donovan,* 3 CIT 54 (1982).

In compliance with the court's order, the Secretary, on April 9, 1982, submitted his redetermination. Finding in the Indiana decisions no new evidence relevant to his initial determination, the Secretary affirmed it. He again found that workers in Departments 225 and 230 of the Marion plant produced, respectively, bearing races and journal crosses; that significant increases in company imports of these articles were associated with decreased production of bearing races and journal crosses; and that these increased imports "contributed importantly" to the layoffs only of the workers in those two departments. 47 Fed. Reg. 16434 (1982).

■ This court may review a decision by the Secretary of Labor which denies a petition for certification of eligibility for trade adjustment assistance benefits to assure that the Secretary's determination is in accordance with law, and is supported by substantial evidence contained in the administrative record. Trade Act of 1974, § 284, 19 U.S.C. § 2395(b) (Supp. IV 1980).

Pursuant to section 222 of the Act, in order to certify plaintiffs as eligible for trade adjustment assistance benefits, the Secretary of Labor's investigation must disclose:

(1) that a significant number or proportion of the workers in such workers' firms or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

If any of these conditions does not exist, the Secretary must deny certification.

### Questions Presented

Four questions are presented for consideration by the court:

(1) whether OTAA's failure to conduct a field investigation was an abuse of discretion;

(2) whether all employees at the Marion plant constituted an appropriate subdivision of the firm;

(3) whether increased imports of journal crosses and bearing races contributed importantly to the layoffs of service workers at the Marion plant; and

(4) whether, in not certifying the production worker plaintiffs as eligible for trade adjustment assistance benefits, the Secretary violated their constitutional guarantee of equal protection of the law.

It is the determination of the court that the Secretary's failure to conduct a field investigation into plaintiff's petition was not an abuse of discretion; that the Secretary's denial of certification as to all production workers, other than those in Departments 225 and 230, is affirmed; that the Secretary's determination as to service workers is not supported by substantial evidence in the administrative record and thus is remanded for redetermination; and that the Secretary's distinction between classes of production workers has a rational basis in law and is not violative of plaintiff's constitutional guarantee of equal protection.

### OTAA's Investigation

■ It has been recognized that administrative officials must have the necessary flexibility to discharge their official responsibilities under the worker adjustment as-

sistance program. While the court may identify flaws in the methodology used by the Secretary, it is not the court's function to substitute its own method of analysis for that of the Secretary. Rather, the court will substantially defer to the Secretary's "chosen technique, only remanding a case if that technique is so marred that the Secretary's finding is arbitrary or of such nature that it could not be based on 'substantial evidence.'" *United Glass & Ceramic Workers v. Marshall,* 584 F.2d 398, 405 (D.C.Cir. 1978).

This court first considered the Secretary of Labor's duty to investigate petitions for certification of eligibility for trade adjustment assistance benefits in *Woodrum v. Donovan,* 4 CIT ——, 544 F.Supp. 202 (1982), *rehearing denied, Woodrum v. Donovan,* 4 CIT ——, Slip Op. 82–78 (September 17, 1982). There, this court held that the Trade Act of 1974 requires the Secretary of Labor to investigate each properly filed petition. Yet, the court held that the nature and extent of an investigation are matters "which properly rest within the sound discretion of the Secretary." *Woodrum,* 4 CIT ——, Slip Op. 82–60 at 10.

Section 248 of the Trade Act of 1974, 19 U.S.C. § 2320 (1976), authorizes the Secretary of Labor to prescribe regulations for the implementation of the trade adjustment assistance program. In particular, 29 C.F.R. § 90.12 (1980) provides that the Director of the Office of Trade Adjustment Assistance shall initiate such investigation as he determines to be necessary and appropriate. The investigation may include one or more field visits to verify information furnished by the plaintiffs and to elicit other relevant information.

█ The administrative record discloses that OTAA conducted its investigation by mail, gathering necessary information, such as the total production, the size of the work force, and the use of imports at the Marion plant. Additionally, OTAA obtained information from major American automobile manufacturers to determine the aggregate domestic production and consumption of drive shafts and universal joints.

Plaintiffs do not maintain that OTAA must conduct a field investigation for every petition. Rather, they allege that in this situation a field investigation was necessary and appropriate. Without the field investigation, plaintiffs contend they were deprived of an opportunity fully to explain the circumstances of their petition. However, plaintiffs have failed to indicate what useful information would have been gathered from a field investigation that was not otherwise obtained. Moreover, it appears that, under the circumstances presented, OTAA's investigation yielded an accurate picture of the relative importance of imports. The court notes that plaintiffs were advised of their right to request a public hearing at which they could present evidence in support of their petition. Yet, plaintiffs never exercised that right, and no public hearing was held.

In conducting its investigation by mail, OTAA applied what it considered a reasonable means of ascertaining a causal link between imports and separations at the Marion plant. In view of plaintiffs' inability to show the appropriateness of and need for a field investigation, the court cannot say that OTAA abused its discretion in conducting its investigation by mail.

*Appropriate Subdivision*

Plaintiffs next assert that all workers at the Marion plant are engaged in employment related to the production of the certified articles, and that, therefore, the Secretary erred in treating Departments 225 and 230 as discrete subdivisions of the Marion plant. In support of their contention, plaintiffs point out that, generally, the two certified articles, journal crosses and bearing races, are not marketed by the Dana Corporation as finished products, but are the principal components used by Dana in the manufacture of drive shafts and U-joint kits. According to plaintiffs, since the certified articles are the principal component parts of the Marion plant's finished products, all of the plant's workers should have been certified as eligible for trade adjustment assistance benefits.

Under the Trade Act of 1974, the Secretary of Labor may certify a group of workers as eligible for trade adjustment assistance benefits only upon finding that the workers in a "firm or an appropriate subdivision of the firm" have been adversely affected by "increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof * * *." Trade Act of 1974, § 222(3), 19 U.S.C. § 2272(3) (1976). By asserting that all workers at the Marion plant should have been certified, the plaintiffs in this case essentially challenge the Secretary's determination that for the purpose of determining eligibility for benefits, Departments 225 and 230, rather than the entire Marion plant, are "appropriate subdivisions" of the Dana Corporation.

 This assertion by plaintiffs ignores the now well-settled principle that determinations of what constitutes an appropriate subdivision must be made along product lines. See *Pemberton v. Marshall,* 639 F.2d 798, 801 (D.C.Cir.1981); *Lloyd v. U.S. Department of Labor,* 637 F.2d 1267, 1275 (9th Cir.1980); *U.A.W. v. Marshall,* 584 F.2d 390, 396–98 (D.C.Cir.1978); *Paden v. U.S. Department of Labor,* 562 F.2d 470, 475 (7th Cir.1977). The Secretary of Labor may certify as eligible for trade adjustment assistance benefits only those workers who are employed in the subdivision that produces the article that is adversely affected by imports of "like or directly competitive" articles.

The principle that certification determinations must be made along product lines was established in *Paden v. U.S. Department of Labor.* In that case, former employees of the Motorola company's Quincy plant, which produced color televisions, monochrome televisions and automotive sound equipment, petitioned for certification of eligibility for trade adjustment assistance benefits. The Secretary of Labor determined that, since importations of only color televisions had increased during the preceding year, only those employees at the Quincy plant who were involved in the pro-

duction of color televisions were eligible for benefits. The court in *Paden* expressly rejected the petitioners contention that all employees of the Quincy plant should be certified, noting that to accept it "would in practicality destroy all distinctions between product lines when throughout the Trade Act Congress carefully limited relief to injury from articles 'like or directly competitive.'" 562 F.2d at 475.

The reasoning of *Paden* was adopted in *Pemberton v. Marshall,* where the court addressed the question whether the workers at a facility operating in conjunction with a certified subdivision were also eligible for trade adjustment assistance benefits. In that case, the workers at Bethlehem Steel's Baltimore Yards contended that they should be considered part of a certified subdivision which included Bethlehem Steel's Sparrows Point Shipyard. The court stated: "The only relevant concern in determining whether a facility is part of the appropriate subdivision is whether it also produces the articles in question." 639 F.2d at 801. The court then went on to hold that since the Baltimore Yards only repaired ships, it did not produce an article which was like or directly competitive with imported ships and could not be included in an appropriate subdivision with the Sparrows Point Shipyard, which manufactured ships.

 The application of these precedents to the instant case compels the court to approve the Secretary's determination that Departments 225 and 230 of the Marion plant are appropriate subdivisions of the Dana Corporation. Only the workers in those two departments are engaged in the production of articles which are like or directly competitive with the imported articles that are causing the injury. While the other departments of the Marion plant do operate in conjunction with the certified departments, *Pemberton,* teaches that the "only relevant concern" in determining whether they are part of the appropriate subdivision is whether they also produce the articles in question. In this case it is clear that the other departments of the Marion plant, other than Departments 225 and 230,

do not produce articles which have been adversely affected by increased imports of like or directly competitive articles.

### Service Workers

The next question is whether the service workers who provided ancillary and support services to both certified and non-certified departments are eligible for trade adjustment assistance.

Here, the record reveals that the service workers who provided ancillary and support services were tool makers, tool and cutter grinders, laborers, millwrights, electricians, machine repairers, stock chasers (fork-lift drivers), salvage inspectors, oilers, metal lab technicians, central storekeepers, inspectors, quality control inspectors, garage mechanics and those employed in the shipping department. The record further discloses that these service workers performed work indispensable to the production of the two articles which were adversely affected by increased imports. Indeed, the Secretary agreed with the conclusion of the Indiana referee "that without the performance of such auxiliary functions no journal crosses or bearing races would be produced."

■ On their face the adjustment assistance provisions of the Trade Act of 1974, and in particular section 222, are silent regarding coverage for service workers. The accompanying legislative history is similarly quiescent. Hence, the court must accord substantial deference to the interpretation of the statute by the agency charged with its administration. *Woodrum v. Donovan*, 5 CIT ——, 564 F.Supp. 826 (1983) (quoting *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981)). The court will sustain the agency's interpretation of the statute where it has a rational basis in law, even though the court might have reached a different interpretation. *John V. Carr & Son, Inc. v. United States*, 69 Cust.Ct. 78, 86 C.D. 4377, 347 F.Supp. 1390, 1396 (1972), *aff'd.*, 61 CCPA 52, C.A.D. 1118, 496 F.2d 1225 (1974). Nevertheless, the court will reject the agency's interpretation or application of a stat-

ute when it is inconsistent with the legislative purpose of the statute or frustrates Congress' intent. *Woodrum*, 5 CIT —— at ——, 564 F.Supp. 826 (quoting *Federal Election Commission*, 454 U.S. at 32, 102 S.Ct. at 42).

■ According to the Secretary's interpretation of the Trade Act of 1974, service workers may not be certified as eligible for trade adjustment assistance benefits unless there was an important causal nexus between increased imports and the layoff of service workers. That nexus is deemed to exist if a substantial amount of the service workers' activity was directly related to the production of the import-impacted article. For five years, the Department of Labor has implemented its interpretation of the statute by requiring that at least 25% of the service workers' activity be expended in service to the subdivision which produces the import-impacted article.

In this case, the Secretary determined that the service workers at the Marion plant were not eligible for benefits because, in the words of the Secretary: "direct labor costs attributable to journal cross and bearing race production were significantly less than 25 percent of direct labor costs for total component production. In other words, the contribution of the service departments to Departments 225 and 230 accounts for significantly less than 25 percent of their contribution to all products in the Marion Plant." On this basis the Secretary concluded that "increased imports did not 'contribute importantly' to the layoffs among workers in the service departments."

This analysis suggests that the Department of Labor compiled data indicating how much of the service workers' activity was expended in service to the certified departments. However, if such data was compiled, the Secretary neglected to include it in the administrative record. Without any supporting data, the Secretary's statement that "significantly less than 25 percent" of the service workers' activity is expended in service to the certified departments is no more than an allegation. Accordingly, the court must hold that the Sec-

retary's determination as to the service workers is not supported by substantial evidence contained in the administrative record and this portion of the action will be remanded.

In remanding this portion of the action for redetermination, the court notes that even if the needed data is added to the administrative record, there is still a flaw in the Secretary's reasoning regarding the service workers at the Marion plant. The Secretary states that, since direct labor costs attributable to production of the certified component are significantly less than 25% of the direct labor costs attributable to total component production, then the service workers contribution to the certified departments must be significantly less than 25% of their contribution to the entire plant. This deduction is accurate only if the efforts of the service departments are evenly distributed throughout the plant. While the service departments indeed distribute their services evenly through the plant, it is also possible that the certified departments are "service intensive," that is, they may require a higher percentage of services than do other departments. The court expects that the Secretary, in his redetermination, will account for the possibility that services are not distributed evenly throughout the plant.

### Equal Protection

There remains the question whether the Secretary's determination resulted in dissimilar treatment of similarly situated workers without a rational basis in violation of their constitutional guarantee of equal protection of the law.

Plaintiffs contend that the Secretary's interpretation of section 222 created two disparate classes of production workers at the Marion plant. The first class consists of the employees in Departments 225 and 230, who were certified as eligible for trade adjustment assistance benefits. The second encompasses the plant's remaining production workers who were not certified.

Plaintiffs maintain this distinction "creates a situation where two workers who perform their duties daily, side by side, did not receive the same outcome because they are assigned to differently designated departments within the same production facility." The Secretary defends the distinction on the basis that the employees in the second class did not produce articles, namely bearing races and journal crosses, that were adversely affected by increased imports of like or directly competitive articles.

Recently, the court focused on this question in the *Woodrum* case. There, plaintiffs maintained that the Secretary's denial of certification resulted in a discriminatory application of the worker adjustment assistance provisions of the Trade Act of 1974. In particular, plaintiffs alleged that employees of automobile dealerships controlled or substantially owned by a domestic automobile manufacturer were granted certification, while employees of independently owned dealerships, such as themselves, were denied certification.

In passing on the equal protection claim, this court held that the differentiation in treatment, assuming all other eligibility requirements of section 222 were satisfied, resulted not from an arbitrary, capricious or improper distinction by the Secretary, but rather from a proper interpretation of the statute. The court further noted that though a classification lacks "mathematical precision, or may in practice result in some inequality, the court will sustain it, so long as the classification has a rational basis." *Woodrum*, 5 CIT —— at ——, 564 F.Supp. 826 (citations omitted).

Similar considerations are applicable here. As in *Woodrum*, the Secretary's denial of certification for production worker plaintiffs was based on their failure to satisfy the criterion of section 222(3), namely that they produce an import-impacted article. The record clearly shows that bearing races and journal crosses were the only articles produced at the Marion plant directly affected by increased imports of like or directly competitive articles. Thus, it was reasonable for the Secretary to conclude that those employees in Departments 225 and 230 should be certified, for they alone constituted the class of intended beneficiaries of the trade adjustment assistance program.

51

Applying the rationale of *Woodrum,* the distinction in classes established by the statute and implemented by the Secretary meets the rational basis standard. Hence, insofar as the distinction applies to production workers, other than those employed in Departments 225 and 230, it is upheld.

*Conclusion*

In summary, it is the determination of the court that, as to the service workers who provide ancillary and support services to both certified and non-certified departments within the plant, the Secretary's denial of certification for eligibility for trade assistance, is not based on substantial evidence and is not in accordance with law. For that reason, as to the service workers, this matter is remanded to the Secretary for a more detailed inquiry and for clarification of the reasons underlying the determinations.

Further, it is the determination of the court that the remainder of the Secretary's determination is affirmed.

The Secretary shall certify the record and report to the court the results of the further proceedings within seventy-five days from the date of the entry of this decision and order.