FORMER EMPLOYEES OF APACHE CORPORATION, Plaintiffs,

v.

UNITED STATES, Defendant.

Slip Op. 94–56.
Court No. 92–06–00404.

United States Court of International Trade.

April 5, 1994.

Juan E. Vigil, Denver, CO, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen. of the U.S., David M. Cohen, Director, Commercial

Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, Patricia L. Petty (Nan Impink, U.S. Dept. of Labor, of counsel), for defendant.

## OPINION

CARMAN, Judge:

Plaintiffs challenge the determination by the Secretary of Labor (Labor) that plaintiffs are ineligible for trade adjustment assistance under 19 U.S.C. § 2272 (1988). This Court has jurisdiction pursuant to 28 U.S.C. § 1581(d)(1) (1988) and, for the reasons which follow, enters judgment for defendant.

### I. BACKGROUND

Plaintiffs filed a petition for trade adjustment assistance on December 26, 1991 in anticipation of layoffs that were due to begin on January 11, 1992. Administrative Record (R.) at 2. At the time of filing, plaintiff were employed in the Denver, Colorado office of the Apache Corporation (Apache). *Id.* According to plaintiffs' petition, "Apache Corporation is an independent oil and gas exploration and production company that markets natural gas and crude oil." *Id.*

In an attachment to their petition, plaintiffs described the bases which they believed entitled them to certification for trade adjustment assistance. R. at 3. Plaintiffs indicated low-priced, imported oil depressed domestic oil and natural gas prices and caused domestic oil and gas producers to cut domestic operations. *Id.* With respect to Apache, plaintiffs claimed foreign competition has adversely affected the company. *Id.* Specifically, plaintiffs stated "Apache's net income declined over thirty percent to $19.8 million through the third quarter 1991." *Id.* Plaintiffs attributed this decline to a "drop in crude oil and natural gas prices ... follow[ing] the Iraqi withdrawal from Kuwait" after the Persian Gulf crisis. *Id.* Plaintiffs noted as compared with the first nine months of 1990, the prices at which Apache sold its oil and natural gas through the first three quarters of 1991 slid 16.49 and 9.21 percent, respectively. *Id.* According to plaintiffs, in order to remedy its economic downturn and as a "direct and calculated response to foreign competition," Apache relocated its head-

quarters to Houston in order to "increase Apache's ability to compete in an industry whose contraction is directly linked to foreign pressure." *Id.* This relocation, maintained plaintiffs, would "cause loss of employment to numerous workers from the Denver office." *Id.* In conclusion, plaintiffs stated "Apache Corporation has been certified in the past, but not the same workers." *Id.*

In response to plaintiffs' petition, Labor initiated an investigation to determine whether plaintiffs were eligible for certification for trade adjustment assistance. *Id.* at 8. After conducting its investigation, Labor made the following findings: (1) "[a]ggregate U.S. imports of like or directly competitive articles ... increased;" (2) "[e]mployment at the firm did ... decline during the relevant period;" (3) "[s]ales at the firm ... did not decline significantly;" and (4) "[p]roduction at the firm did not decline significantly." *Id.* at 199.

On March 4, 1992, Labor published its Notice of Negative Determination Regarding Eligibility To Apply for Worker Adjustment Assistance which indicated plaintiffs were ineligible for certification. *Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance*, 57 Fed.Reg. 7793, 7794 (Dep't of Labor 1992); *see also* R. at 200. In its Notice, Labor identified the three criteria that plaintiffs had to meet to be eligible for certification and concluded plaintiffs did not meet the second criterion, namely "that sales or production, or both, of such firm or subdivision have decreased absolutely." R. at 200–01. Specifically, Labor noted "[s]ales and production at Apache Corporation increased in 1990 compared to 1989, and increased in January through September, 1991, compared to the same period of 1990." *Id.* at 201. Labor also indicated Apache's anticipated layoffs were attributable to the relocation of the company's headquarters from Denver, Colorado to Houston, Texas. *Id.*

Plaintiffs subsequently asked Labor to reconsider its negative determination on March 17, 1992. *Id.* at 206. Plaintiffs sought reconsideration "because production volumes rather than sales were used in reaching the

conclusion" that plaintiffs were ineligible for certification. *Id.* According to plaintiffs,

> Apache has historically been an acquisition company, recently acquiring more than $514 million of producing properties from Amoco. For this reason, price is a more equitable and less distorting basis than production volumes in this analysis. An examination of production alone fails to properly identify the negative impact of foreign trade on this industry as a whole and specifically on Apache.

*Id.* Plaintiffs' submission reiterated with greater specificity the position plaintiffs had taken in their original petition—that inexpensive, imported oil and natural gas have depressed domestic prices and have caused Apache's prices and sales to decline. *Id.* at 206–07, 209. In addition, plaintiffs claimed "[t]he increased imports of crude oil and natural gas have impacted the Rocky Mountain region most strongly, where exploration and production costs are much higher." *Id.* at 207 (footnotes omitted). Plaintiffs also emphasized Apache's efforts to find and exploit foreign oil reserves. *Id.* at 207–08. Plaintiffs concluded "the increase of foreign imports of crude oil and natural gas have contributed directly to the loss of jobs for workers at the Denver office of Apache Corporation." *Id.* at 210. One of the plaintiffs later advised Labor by telephone that Labor had granted certification to other workers in the Denver area and prices and profits for crude oil had decreased due to imports. *Id.* at 241.

On April 16, 1992, Labor published its Notice of Negative Determination Regarding Application for Reconsideration in response to plaintiff's request. *Negative Determination Regarding Application for Reconsideration,* 57 Fed.Reg. 13,382 (Dep't of Labor 1992) (*Reconsideration Notice* ); R. at 244. Labor's Notice stated the following:

> Investigation files show that up to mid-1991 Apache was primarily a gas producer with crude oil production. On July 1, 1991 Apache acquired MW Petroleum Corporation, a subsidiary of Amoco. This acquisition greatly increased Apache's crude oil and natural gas production. Further, before Apache acquired MW Petroleum in mid–1991, Apache had increased sales and production of crude oil and increased sales and production of natural gas in 1990 compared to 1989 and in the first six months of 1991 compared to the same period in 1990.

> The findings also show that Apache, in order to effectively integrate and manage its acquired properties, is in the process of moving its headquarters from Denver to Houston. This corporate decision would not form a basis for a worker group certification.

*Reconsideration Notice,* 57 Fed.Reg. at 13,-382; R. at 245–46. Labor acknowledged the fact that workers associated with other oil and gas companies in Denver, Colorado had received certifications for eligibility in February 1987, November 1989, and February 1991, but emphasized "[w]orker petitions are judged individually on their own merits as to whether they meet the [eligibility requirements] in the time period in which they were filed." *Reconsideration Notice,* 57 Fed.Reg. at 13,382–83; R. at 246. Labor concluded it would not reconsider its prior decision finding plaintiffs ineligible for certification. *Reconsideration Notice,* 57 Fed.Reg. at 13,383; R. at 247.

## II. CONTENTIONS OF THE PARTIES

### A. *Plaintiffs*

Plaintiffs advance four principal contentions in support of its position that Labor's determinations were erroneous. First, plaintiffs contend Labor "failed to consider facts which, as a matter of law, should have properly been considered." Pls' Br. at 1. Specifically, plaintiffs argue Labor did not address the fact that the agency had certified two former Apache employees in 1989 "at a time when Apache Corporation was less impacted by foreign trade than it was during the time period in question in this appeal." *Id.* at 2.

Plaintiffs' second principal contention is that Labor erroneously concluded plaintiffs did not meet the second group eligibility requirement contained in 19 U.S.C. § 2272(a)(2). *Id.* Plaintiffs claim Labor's conclusion was improper because the agency did not use the "appropriate subdivision." *Id.* at 3 (citing *International Union v. Mar-*

*shall,* 584 F.2d 390, 397 (D.C.Cir.1978)). According to plaintiffs, Labor used "Apache Corporation and its Subsidiaries" as the "appropriate subdivision" and relied on their production and sales figures to conclude "Apache's oil and gas production had increased from 1989 to 1990 and from 1990 to 1991." *Id.*

Instead of using the "Apache Corporation and its Subsidiaries," plaintiffs maintain Labor should have used the "Rocky Mountain Region" (RMR) as the appropriate subdivision. *Id.* Plaintiffs claim "the RMR meets the requirements of an appropriate subdivision" because Apache "established [a] separate cost center[ ] within each region" that "was responsible for its own revenues, costs, and overhead" and accounted for "revenue and expenses, including wages . . . separately for each producing region." *Id.* Had Labor analyzed data from the RMR, plaintiffs assert, the agency would have certified plaintiffs "because during the time period in question each well in the RMR had decreased production and sales." *Id.* at 4. In addition, plaintiffs argue they identified "Apache Corporation (Denver Office)" as the subdivision for Labor to investigate and thereby indicated their intent that Labor investigate the Denver office rather than the whole corporation. Pls' Reply Br. at 2. Moreover, because plaintiffs "alleged that imports greatly impacted upon the [RMR]" in their request for reconsideration, plaintiffs claim they "clearly identified the [RMR] as the appropriate subdivision." *Id.*

Plaintiffs' third principal contention is that Labor failed to factor out variables which plaintiffs claim "skewed the totals over the period making the aggregate figures appear to be increasing." Pls' Br. at 4. Specifically, plaintiffs suggest Labor should have excluded data derived from wells acquired by Apache in mid–1990 which "increased production in the RMR," and from wells acquired in mid–1991, which boosted the company's production by 75 percent. *Id.* While plaintiffs acknowledge these acquisitions "had the aggregate effect of increasing total production and sales figures," plaintiffs nevertheless assert "each well in the RMR had decreased production and sales." *Id.*

The other variables for which plaintiffs urge Labor should have accounted were Apache's "temporary average price increase" and "artificially created inflated sales totals" due to the Persian Gulf crisis. *Id.* at 4–5. Plaintiffs argue Labor "erroneously determined that Apache Corporation had sold more oil, because revenues had increased" when, in fact, the increased revenues "resulted from an increase in price in anticipation of low supply of oil." *Id.* at 5. According to plaintiffs, "[t]he price of crude oil which increased dramatically was reflected in increased sales but not in increased production by Apache Corporation. This consequently affected the employment of the Plaintiffs . . . ." *Id.*

Plaintiffs' fourth principal contention is that Labor should have conducted a field investigation. *Id.* at 5–6 (citing *Abbott v. Donovan,* 6 CIT 92, 570 F.Supp. 41 (1983)). Plaintiffs argue "[a] field investigation would have revealed that the RMR was an appropriate subdivision and that the RMR was affected in a different way than other areas of the country which were involved in the production of oil and gas." *Id.* at 6. Plaintiffs suggest such an investigation would have shown Labor the particular problems experienced in the RMR. *Id.*

Finally, plaintiffs raise two constitutional arguments against Labor's determinations in this case. First, plaintiffs argue Labor denied them due process because the agency never informed them "they could request a public hearing at which they could present evidence to support their petition." *Id.* Second, plaintiffs assert Labor's determination violates the Equal Protection Clause. *Id.* Plaintiffs attribute this violation to the fact that Labor denied plaintiffs certification after having granted certification to similarly situated workers from Apache and other Denver companies. *Id.*

**B.** *Defendant*

Defendant contends this Court should sustain Labor's determinations for several reasons. First, defendant argues Labor properly considered sales and production of Apache as a whole. Def's Br. at 8. Defendant asserts Labor's choice to use Apache's overall

figures was proper because plaintiffs relied on such information in their original petition. *Id.* at 9–10 (citing R. at 3, 6).

Second, defendant maintains nothing on the record supports plaintiffs' claim that Labor should have only used data from the RMR. Defendant asserts plaintiffs never mentioned "a Rocky Mountain Region or subgroup" in their initial petition. *Id.* While defendant acknowledges "plaintiffs alleged that imports greatly impacted upon the [RMR]" in their petition for reconsideration, defendant maintains this petition "requested that Labor examine the sales figures of the corporation, as opposed to Labor's initial analysis of production volumes." *Id.* (citing R. at 206). As plaintiffs first indicated Labor should have relied on information from the RMR in their complaint before the CIT, defendant argues plaintiffs failed to exhaust their administrative remedies and cannot now raise this issue in this Court. *Id.* at 10–11 (citing 28 U.S.C. § 2637(d) (1988)) (other citations omitted). Moreover, defendant urges plaintiffs have not demonstrated why Apache's RMR data is more relevant than data from the company as a whole. *Id.* at 11. In sum, defendant claims plaintiffs failed to establish they have a particular relationship to the RMR. *Id.* at 11–12. As a result, defendant maintains it was reasonable for Labor to consider Apache's overall data. *Id.* at 12.

Third, defendant contends Labor properly found Apache's sales and production did not decrease over the relevant time period. Defendant notes Apache's production and sales figures indicate the company has had annual increases in oil and gas production and revenue since 1987. *Id.* at 14 (citing R. at 40, 134, 138). In addition, defendant emphasizes the company realized increased revenues in the first two quarters of 1990 over the same period in 1989, notwithstanding the company's acquisition in July 1990. *Id.* Accordingly, even if Labor excluded the acquisition from consideration, as plaintiffs urge, defendant claims the record shows Apache experienced increased sales and production. *Id.*

Moreover, even assuming increased crude oil prices occasioned by the Persian Gulf crisis prompted greater sales by Apache, defendant maintains the company's annual production and sales increases since 1987 preclude the conclusion that such increases were only attributable to the Gulf crisis. *Id.* at 14–15.

Fourth, defendant asserts plaintiffs' constitutional claims are meritless. With respect to plaintiffs' due process claim, defendant notes Labor published a notice in the Federal Register informing plaintiffs of their right to request a public hearing.[1] *Id.* at 18. According to defendant, even if plaintiffs did not have actual notice of this right, plaintiffs have not demonstrated they suffered prejudice as a result of not having had a hearing. *Id.*

As to plaintiffs' equal protection claim, defendant urges plaintiffs fail to establish how they and the other workers who received certification are similarly situated. *Id.* at 19. Defendant argues Labor had a rational basis for denying plaintiffs certification and distinguishing between plaintiffs and the other workers because plaintiffs did not satisfy the requirements of 19 U.S.C. § 2272 as the other workers had. *Id.* at 20 (citing *Former Employees of Homestake Mining Co. v. Brock,* 12 CIT 270, 274 (1988)).

### III. STANDARD OF REVIEW

In reviewing a determination made by Labor, this Court must decide whether the determination is supported by substantial evidence on the record and is otherwise in accordance with law. *See Woodrum v. Donovan,* 5 CIT 191, 193, 564 F.Supp. 826, 828 (1983), *aff'd sub nom., Woodrum v. United States,* 2 Fed.Cir. (T) 82, 737 F.2d 1575 (1984). Labor's findings of fact are conclusive if supported by substantial evidence. 19 U.S.C. § 2395(b) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

---

1. *See Investigations Regarding Certifications of Eligibility To Apply for Worker Adjustment Assis-* tance, 57 Fed.Reg. 1761 (Dep't of Labor 1992).

## IV. DISCUSSION

"Trade adjustment assistance benefits [provide] unemployment compensation, training, job search and relocation allowances, and other employment services to workers who lose their jobs because of import competition." *Former Employees of Merrow Mach. Co. v. Martin*, 17 CIT ——, ——, 812 F.Supp. 217, 220 (1993) (citation omitted). The process of obtaining these benefits begins when a worker or group of workers files a petition with Labor for certification of eligibility to apply for the benefits. *See* 19 U.S.C. § 2271 (1988). Labor will then determine whether the workers' petition demonstrates

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272(a). Labor must certify the workers as eligible to apply for trade adjustment assistance benefits if it determines the workers meet all three criteria contained in § 2272(a). *See Merrow*, 17 CIT at ——, 812 F.Supp. at 220. The issue before the Court is whether Labor's determination that plaintiffs were ineligible for certification is supported by substantial evidence on the record and is otherwise in accordance with law. For the reasons which follow, the Court concludes Labor's determination is supported by substantial evidence on the record and is otherwise in accordance with law.

### A. *Scope of Labor's Inquiry*

 The first criteria set forth in § 2272(a) requires Labor to consider the extent of worker separation on a firm-wide basis or on the basis of "an appropriate subdivision of the firm." *See* § 2272(a)(1). In this case, Labor relied on Apache's firm-wide data in finding the company's sales and production had increased in 1990 over 1989 and in January through September 1991 over the same period in 1990. *See* R. at 201, 245–46. Plaintiffs argue Labor should only have considered Apache's data for the RMR. Pls' Br. at 3.

Plaintiffs' position lacks merit because plaintiffs never claimed during the administrative proceedings before Labor that the agency should only consider the RMR. In their original petition, plaintiffs identified themselves as employees of the "Apache Corporation (Denver Office)." R. at 2. Plaintiffs also attached an article from the Denver Post from June 13, 1991, which described, in part, the continued low demand and prices for "Rocky Mountain natural gas." *Id.* at 4. The Court finds plaintiffs' petition and attachment simply do not amount to a request that Labor confine its analysis to Apache's data from the RMR. Accordingly, the Court concludes plaintiffs' proffer did not constitute an interpretation of § 2272(a) that Labor was required to consider. *See International Union*, 584 F.2d at 396 ("[W]hen a petitioner under a government benefits program put forward an interpretation of a legislative provision that is arguably consonant with the statutory language, he is at least entitled to a reasoned statement why the administrator will not adopt that interpretation.").

Plaintiffs' application for reconsideration similarly failed to single out the RMR as the "appropriate subdivision" that, in plaintiffs' view, Labor should consider. Most of plaintiffs' application addressed the depressed condition of the domestic market for crude oil and natural gas and discussed Apache's firm-wide efforts toward protecting the company's economic health. *See* R. at 206–10. The only explicit references to the RMR in plaintiffs' application appear in plaintiffs' claim that "increased imports of crude oil and natural gas have impacted the Rocky Mountain region most strongly, where exploration and production costs are much higher[ ]"[2] and in various newspaper articles attached to

2. R. at 207 (footnotes omitted).

plaintiffs' application. R. at 217–26. Plaintiffs also indirectly referred to the RMR in concluding "the increase of foreign imports of crude oil and natural gas have contributed directly to the loss of jobs for workers at the Denver office of Apache Corporation." *Id.* at 210. As with plaintiffs' original petition, the Court finds the foregoing allusions to the RMR in plaintiffs' application did not constitute an interpretation of § 2272(a) that Labor was required to consider. *See International Union,* 584 F.2d at 396.

Plaintiffs' position with respect to Labor's failure to consider only the RMR is also deficient because the data that plaintiffs submitted to the agency pertained to Apache's firm-wide activities and were not limited to the RMR. As noted above, plaintiffs attached to their original petition an article from the Denver Post which described, in part, the continued low demand and prices for "Rocky Mountain natural gas." R. at 4. Plaintiffs, however, also included two Apache Corporation press releases and a corporate financial statement which pertained to the company's firm-wide activities and economic performance. *Id.* at 5–7.

In addition, plaintiffs' application for reconsideration is replete with references to Apache's firm-wide activities and economic performance. *See id.* at 206–10. Plaintiffs' attachments to the application also contain financial information relating to the United States domestic oil and gas industry as a whole and Apache's overall, average quarterly oil and gas prices. *Id.* at 212–16, 230. Moreover, the various newspaper articles that plaintiffs included discussed the overall decline in the United States domestic oil and gas industry, the impact of this decline in the RMR, and the international oil and gas markets. *Id.* at 217–26, 233–36. Finally, the press releases that plaintiffs submitted with their application address Apache's international acquisition efforts in Indonesia and Australia, as well as the company's decision to curtail its spot market gas sales in Oklahoma. *Id.* at 227–29, 231–32. Because the information that plaintiffs provided dealt with Apache's firm-wide activities and economic performance and the United States domestic oil and gas industry as a whole, and

plaintiffs never proposed to Labor that the agency only consider data from the RMR, the Court finds the reasons for Labor's choice to use Apache's firm-wide data "are evident on the record." *See International Union,* 584 F.2d at 397. Consequently, the Court concludes Labor's decision to rely on Apache's firm-wide data is supported by substantial evidence on the record and is otherwise in accordance with law. *See Former Employees of CSX Oil & Gas Corp. v. United States,* 13 CIT 645, 651, 720 F.Supp. 1002, 1008 (1989) ("It is well established that while Labor has a duty to investigate, the nature and extent of the investigation are matters resting properly within the sound discretion of the administrative officials.") (quotations and citations omitted).

### B. *Labor's Methodology*

Plaintiffs also challenge two aspects of Labor's investigative methodology. First, plaintiffs argue Labor should have excluded data derived from wells in the RMR that Apache acquired in mid–1990, which plaintiffs claim boosted the company's production by 75 percent. Pls' Br. at 4. Despite the fact that plaintiffs acknowledge these acquisitions "increas[ed] total production and sales figures," plaintiffs assert "each well in the RMR had decreased production and sales." *Id.*

Plaintiffs' position is unpersuasive. In short, because Labor's decision not to limit its investigation to data from the RMR was reasonable, plaintiffs cannot successfully challenge Labor's methodology on the grounds that it did not exclude data from outside the RMR.

Plaintiffs' second challenge to Labor's investigative methodology is that Labor should have accounted for price and sales increases that plaintiffs claim Apache realized as a result of the Persian Gulf crisis. *Id.* at 4–5. According to plaintiffs, "[t]he price of crude oil which increased dramatically was reflected in increased sales but not in increased production by Apache Corporation. This consequently affected the employment of the Plaintiffs . . . ." *Id.* at 5.

Plaintiffs' second challenge to Labor's methodology is also without merit. Even assuming the crude oil prices that Apache realized stemmed from the Gulf crisis, the record does not support plaintiffs' assertion that Apache's production levels did not rise. Apache's Form 10–K filed with the Securities and Exchange Commission clearly indicates, in addition to price rises attributable to the Gulf crisis, Apache's "[o]il production increased 10 percent from 1989 to 1990 and 37 percent from 1988 to 1989 largely due to acquisitions." R. at 41. Moreover, Apache's 1991 financial data shows the company's oil and gas production increased in the first two quarters of 1991 over the same period in 1990. *Id.* at 238–39. While Labor may not have scrutinized the bases underlying Apache's price and production increases, the Court nevertheless finds the agency's conclusion with respect to Apache's price and production levels is supported by substantial evidence on the record and is otherwise in accordance with law. *See Abbott,* 6 CIT at 97, 570 F.Supp. at 47 ("While the court may identify flaws in the methodology used by the Secretary, it is not the court's function to substitute its own method of analysis for that of the Secretary. Rather, the court will substantially defer to the Secretary's 'chosen technique, only remanding a case if that technique is so marred that the Secretary's finding is arbitrary or of such nature that it could not be based on 'substantial evidence.' ' ") (quoting *United Glass & Ceramic Workers v. Marshall,* 584 F.2d 398, 405 (D.C.Cir.1978)). Consequently, the Court concludes the agency's finding that plaintiffs did not meet the requirements of 19 U.S.C. § 2272(a)(2) is supported by substantial evidence on the record and is otherwise in accordance with law.[3]

## C. *Field Investigation*

Plaintiffs claim Labor's investigation was defective because the agency did not conduct a field investigation. Plaintiffs assert such an investigation "would have revealed that the RMR was an appropriate subdivision and that the RMR was affected in a different way than other areas of the country which were involved in the production of oil and gas." Pls' Br. at 6.

The Court concludes Labor was not required to conduct a field investigation in this case. Such investigations are clearly not mandatory, but may be appropriate when they would reveal useful information that Labor could not otherwise obtain. *See Abbott,* 6 CIT at 98, 570 F.Supp. at 47. Even if the Court were to assume plaintiffs asked Labor during the administrative proceedings to use the RMR as the appropriate subdivision, the Court finds plaintiffs have failed to demonstrate what evidence the agency would have found during a field investigation that it did not already possess or could not have obtained. Plaintiffs' bald assertion before the Court that a field investigation would have somehow demonstrated to Labor the RMR was an "appropriate subdivision" and the region's oil and gas industry has sustained unique economic injuries lacks the specificity that would establish the need for a field investigation in this case. Consequently, "[i]n view of plaintiffs' inability to show the appropriateness of and need for a field investigation, the court cannot say [Labor] abused its discretion in conducting its investigation by mail." *Id.,* 6 CIT at 98, 570 F.Supp. at 47.

## D. *Constitutional Claims*

### 1. Due Process

Plaintiffs argue Labor denied them due process because the agency never informed them "they could request a public hearing at which they could present evidence to support their petition." Pls' Br. at 6. Labor's regulations require the agency to conduct a public hearing when it receives a request for such a hearing within ten days after it has published

---

**3.** The Court notes although Labor hinged its determination on plaintiffs' failure to satisfy § 2272(a)(2)'s requirement that "sales or production ... have decreased absolutely," the fact that plaintiffs' separation may have been due to Apache's decision to relocate its headquarters to Houston suggests plaintiffs may not have been able to meet § 2272(a)(3) either. *See* R. at 108, 201, 245–46. Nevertheless, because Labor's determination did not depend on plaintiffs' failure to fulfill § 2272(a)(3), the Court does not address § 2272(a)(3) in detail.

notice in the Federal Register of receipt of a petition. 29 C.F.R. § 90.13(a) (1991).

■ "This Court has repeatedly stated that as a matter of due process, Labor should provide *pro se* petitioners with actual notice of the 10–day period in which to request a hearing." *Former Employees of Bass Enters. Prod. Co. v. United States,* 12 CIT 470, 473, 688 F.Supp. 625, 628 (1988) *(Bass )* (citations omitted). The plaintiffs in this case proceeded in their action before Labor *pro se* and therefore should have received *actual* notice of their right to a public hearing under 29 C.F.R. § 90.13(a).[4] Nothing in the record before the Court indicates plaintiffs received such notice. At most, Labor's notice of receipt of plaintiffs' petition in the Federal Register which indicated parties such as plaintiffs have a right to a public hearing placed plaintiffs on *constructive notice* of their right. *See Investigations Regarding Certifications of Eligibility To Apply for Worker Adjustment Assistance,* 57 Fed.Reg. 1761 (Dep't of Labor 1992); *see also* R. at 12.

Nevertheless, Labor's failure to provide plaintiffs with actual notice does not amount to a denial of due process if the lack of notice did not prejudice plaintiffs. *See Bass,* 12 CIT at 474, 688 F.Supp. at 628–29; *Former Employees of Homestake Mining Co.,* 12 CIT at 276. Nothing in the record or in plaintiffs' papers indicates whether and in what manner plaintiffs suffered prejudice as a result of not having received actual notice of their right to a public hearing. Defendant claims plaintiffs did not suffer any prejudice based on the following reasons: (1) plaintiffs were able to submit numerous supporting documents along with their original petition and application for reconsideration;[5] (2) one of the plaintiffs had a telephone conversation with Labor and provided additional arguments that Labor considered in connection with plaintiffs' application for reconsideration;[6] and (3) "plaintiffs have failed to indicate that they possessed any pertinent information that they had not previously submitted to Labor."[7] The Court agrees with de-

fendant and finds, for the reasons set forth by defendant, Labor's failure to provide plaintiffs with actual notice of their right to a public hearing did not prejudice plaintiffs. Accordingly, the Court concludes Labor did not deny plaintiffs due process. Notwithstanding this conclusion, the Court reaffirms the well-established principle that Labor must provide *pro se* petitioners with actual notice of their right to public hearing under 29 C.F.R. § 90.13(a).

### 2. Equal Protection

Plaintiffs argue Labor denied them equal protection of the law because Labor refused to certify plaintiffs after having certified other similarly situated workers from Apache and other Denver companies. Pls' Br. at 6. Specifically, plaintiffs note Labor certified two former employees of Apache in 1989 "at a time when Apache Corporation was less impacted by foreign trade than it was during the time period in this appeal." *Id.* at 2.

■ The Court is unpersuaded that Labor denied plaintiffs equal protection of the law. First, nothing in the record supports plaintiffs' assertion that two former employees of Apache received certification from Labor in 1989. Even assuming the record supported plaintiffs' assertion, the fact that at least two years separate the periods of inquiry with respect to the former employees' and plaintiffs' petitions militates against the conclusion that the former employees and plaintiffs are similarly situated. In short, the economic factors that enter into Labor's trade adjustment assistance determinations clearly vary over time. More important, however, plaintiffs have not pointed to any evidence on the record that indicates the factors that may have supported the former employees' certification have remained constant. Absent such evidence, this Court declines to require Labor to assume the factors underlying the former employees' certification have remained constant and thus support plaintiffs' petition in this action. In addition, for the

---

4. The Court notes plaintiffs are represented by counsel in their action before this Court.

5. Def's Br. at 18 (citing R. at 2–7, 206–40).

6. *Id.* (citing R. at 241, 243).

7. *Id.*

reasons discussed previously in connection with the scope of Labor's investigation and the agency's methodology, the Court concludes Labor had a rational basis for denying plaintiffs' petition. Consequently, to the extent plaintiffs' equal protection argument relies on the past certification of Apache employees, this argument must fail.

Second, the fact that Labor certified other workers in the RMR for trade adjustment assistance benefits does not demonstrate Labor discriminated against plaintiffs. The plain language of the statute governing Labor's investigation, 19 U.S.C. § 2272, requires the agency to consider the merits of a petition in light of the facts and circumstances surrounding the company and industry in which the petitioner seeking relief formerly worked. *See* § 2272(a) (requiring Labor, among other things, to examine a petitioner's "firm or appropriate subdivision of the firm," analyze the firm's or subdivision's "sales or production," and whether competing imports have affected petitioner's employment status and the firm's or subdivision's sales or production). Because the condition of the company from which the petitioner has been separated is critical to Labor's investigation and eventual determination, this Court does not find the fact that one company's former employees have received certification is necessarily probative of the particulars involved in an investigation of a wholly separate company. As with plaintiffs' reliance on former employees of Apache that received certification, plaintiffs' reliance on the certification of former oil and gas workers from the Denver area is misplaced. In sum, nothing in the record or in plaintiffs' papers suggests the factors that supported the other Denver workers' certification apply to plaintiffs' case. As a result, the Court cannot conclude plaintiffs and the other Denver-area workers are similarly situated persons. Consequently, to the extent plaintiffs' equal protection argument relies on the certification of workers in the Denver area, this argument must fail.

### V. CONCLUSION

After considering all of plaintiffs' arguments, the Court makes the following holdings: (1) Labor's decision to rely on Apache's firm-wide data is supported by substantial evidence on the record and is otherwise in accordance with law; (2) Labor's decision not to exclude data from wells that Apache acquired in mid–1990 is supported by substantial evidence on the record and is otherwise in accordance with law; (3) Labor's conclusion that plaintiffs failed to satisfy 19 U.S.C. § 2272(a)(2) is supported by substantial evidence on the record and is otherwise in accordance with law; (4) Labor's decision to conduct its investigation by mail and telephone is supported by substantial evidence on the record and is otherwise in accordance with law; (5) Labor's failure to provide plaintiffs' with actual notice of their right to a public hearing under 29 C.F.R. § 90.13(a) did not amount to a denial of due process; and (6) Labor did not deny plaintiffs equal protection of the law by not certifying plaintiffs after having previously certified other workers from Apache and other oil and gas companies in the Denver area.

### ORDER

This case having been duly submitted for decision, and the Court after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that plaintiffs' motion is denied; and it is further

**ORDERED** that the Department of Labor's determination in *Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance,* 57 Fed.Reg. 7793, 7794 (Dep't of Labor 1992) is sustained insofar as it pertains to the rights of the plaintiffs in this action; and it is further

**ORDERED** that the Department of Labor's determination in *Negative Determination Regarding Application for Reconsideration,* 57 Fed.Reg. 13,382 (Dep't of Labor 1992) is sustained; and it is further

**ORDERED** that this action is dismissed.